O. A. JOHNSON et al., Appellants, v. HARRIETT J. JOHNSON,
Appellee.

**FRAUDULENT CONVEYANCES:** Confidential Relations—Burden on
1   **Donee of Gift.** A wife who becomes such through the husband's
second marriage, and who, to a material extent, becomes his busi-
ness adviser, and, at her own active instigation, becomes the bene-
ficiary of a gift of real estate of substantial value, at a time when
he, by a fatal illness, is reduced to a state of great physical and
mental disability and dependence, must assume the burden to show
that the transaction was entirely free from all fraud and undue
influence. Evidence reviewed, and held insufficient to meet such
burden.

**FRAUDULENT CONVEYANCES:** Evidence—Relation and Situation
2   **of Parties.** On the issue whether a gift by a husband to his wife
was fraudulently induced, or was just, fair, and reasonable, due
consideration will be given to the fact (1) that the wife became
such by the husband's second marriage, and when his life expec-
tancy was short; (2) that the gift was a homestead, of substantial
value; (3) that the grantor had adult children surviving, who had
aided in the accumulation of his property; and (4) that the wife
was entitled to a distributive share in the husband's property.

*Appeal from Marshall District Court.*—J. W. WILLETT, Judge.

JANUARY 20, 1923.

REHEARING DENIED SEPTEMBER 19, 1923.

SUIT in equity, to set aside a deed which conveyed a cer-
tain residence property in the city of Marshalltown. The gran-
tor was William S. Johnson, and the grantee was his wife,
Harriett J. Johnson, defendant herein. The plaintiffs are the
sons and only heirs of William S. Johnson, who died shortly
after the execution of the deed. There was a cross-bill by the
defendant, asking to quiet her title. There was a decree dis-
missing the petition and quieting the title of the defendant. The
plaintiffs appeal.—*Reversed and remanded.*

*Lee & Garfield,* for appellants.

*E. N. Farber,* for appellee.

EVANS, J.—I.  The grounds of attack are:  (1)  That the grantor lacked mental capacity to make the deed at the time it was made; (2) that the deed was obtained by undue influence, and was without consideration.

William S. Johnson married the defendant in June, 1916. He was at that time a widower, 77 or 78 years old.  His active life had been spent upon a farm which he owned in Story

1. FRAUDULENT
   CONVEYANCES:
   confidential re-
   lations: burden
   on donee of gift.

County.  Prior to the marriage, the defendant was a maiden lady, about 23 years younger than Mr. Johnson, who had engaged in active mercantile business for many years.  He was then residing in Marshalltown, and she at Emmetsburg.  He had lived for a time at the home of her sister, Mrs. Molison, in Marshalltown.  After the marriage, they lived for a year or two at Emmetsburg, and then removed to Marshalltown, where they occupied as their home the property now in controversy.  In the latter part of August, 1919, Johnson became very ill.  He was taken to the hospital about September 1st, and continued in the care of physicians and nurses constantly from that date until his death, on October 21st.  The deed in question was executed by him while at the hospital, on September 29, 1919. The evidence is sharply conflicting at many points.  The two doctors in charge were Molison and Chesire, the first being the attending physician, and the second being the surgeon who was called in to perform certain operations.  The plaintiffs examined Molison as a witness in their behalf.  The defendants examined Chesire as their witness.  Their evidence is far from harmonious.  Other witnesses for the respective parties contradict each other sharply.  There are, however, certain salient facts of great importance, which in the main are quite outside the range of dispute.  Dr. Molison was the regular attending physician of the decedent up to October 1st.  He had been the decedent's physician for several years.  Dr. Chesire was called in consultation on September 1st, and performed an operation on September 6th.  He continued his visits to the patient up to September 16th, after which date he was absent from the state

until September 27th. Dr. Molison visited the patient two or three times every day from the beginning of his illness until October 1st.

It is undisputed that, upon September 1st, the patient was in a state of coma, as a result of his illness. He had been in such condition for several days. He was suffering from nephritis. Whether it was acute or chronic is in dispute. He suffered from prostate trouble. This had reached such a stage as to stop urination. This was supposed to be a cause, or partial cause, of the nephritis. The coma was the result of uremic poisoning. The use of the catheter was resorted to, but it failed to relieve the trouble. A drainage operation was therefore performed on September 6th. A tube was inserted in the wound, and the drainage of the bladder was thereby accomplished. The purpose of this operation was preparatory to a later operation for the removal of the prostate gland. Such second operation was had on October 11th. Two nurses were in charge of the patient, one for the night and one for the day. The defendant also was constantly at the bedside.

The evidence for the plaintiffs tends to show that the mental capacity of the decedent was never restored; that he was in an advanced state of arteriosclerosis; that he suffered from cerebral hemorrhage; that, about September 16th, he began to have delusions; that his articulation of speech became impaired; and that, regardless of the question of his actual mental capacity, he did not, at any time in the circumstances surrounding him, have the power to exercise his own free wish and will, as against the wish and will of the defendant.

The evidence for the plaintiffs also tended to show that the defendant was the stronger personality, and that, during their brief married life, she attended the decedent in his business transactions, and that she herself performed much of the business and issued the majority of the checks; that, for some time prior to the execution of the deed, she had repeatedly requested its execution, and had solicited the aid of others in bringing it about; that she employed the decedent's attorney to assist her in that regard; that he came to Marshalltown upon such business at her request; that she was present at every conference

between the attorney and the decedent, and was present at the time of the consummation.

The evidence for the defendant tended to show that, after the operation of September 6th, the mind of the decedent cleared up, and that his capacity was fully restored, and that he acted intelligently in the execution of the deed, and in accord with his own wish and will. It also tended to show that he had the benefit of the advice and help of his own legal adviser, who prepared the conveyance.

In view of the undisputed mental incapacity of the decedent at a stage of his illness prior to the execution of the deed, the plaintiffs made a prima-facie case, and the burden was thereby cast upon the defendant to show the restoration prior to September 29th; and in view of the decedent's undoubted weakened condition, both mental and physical, and of his own helplessness and utter dependence upon his wife to provide for him, she must be deemed the dominant personality, and fiduciary, at least for the time being. The burden was therefore cast upon the defendant to show, not only the mental capacity of the decedent, but also that the execution of the deed was not the result of the stress of undue influence, exercised upon him in his helplessness.

Needless to say that the testimony of the respective doctors is very important. In weighing the same, some incidental matters should be considered. Friction arose between Dr. Molison and the defendant, which resulted in his ceasing his connection with the case on October 1st. He is the brother-in-law of the defendant, his wife being her sister. Both he and his wife were witnesses for the plaintiffs, and apparently willing ones. There is thereby an indication of personal hostility, which materially impairs the weight of the evidence of each. We make due allowance for it in the consideration of the record. On the other hand, Dr. Chesire, up to October 1st, was not the physician in charge, but was the surgeon who performed the operation. Owing to his absence from the state, he did not see the patient at all from September 16th to September 27th, which latter date was on Saturday. The execution of the deed occurred on the following Monday morning. Chesire's opportunity of contact and observation during the two weeks preceding the date of the

execution of the deed was not approximately equal to that of Molison. The persons present at the time of the execution were Mrs. Johnson, the defendant, Mr. Underwood, the attorney, Miss Weaver, the stenographer, and Mrs. Woodson, the nurse. Mrs. Woodson is a personal friend of the defendant's, and was making her home with her at and before the time of the trial. Underwood *had been* the legal adviser of the decedent. He had been solicited by the defendant upon at least two prior occasions to procure the deed for her. He came to Marshalltown on Sunday, September 28th, at her request, and in effect accepted employment by her. All his conferences with the decedent were in her presence. He assumed the role of a scrivener only. He entered a charge upon his books against both the defendant and the decedent. He was, therefore, not representing the decedent as a legal adviser in any respect which could be deemed hostile to the defendant. The immediate circumstances of the execution are described by the parties present. It appears therefrom that the decedent was propped up with pillows; that Mrs. Woodson supported him on one side, and Mr. Underwood on the other; that Underwood adjusted his glasses and held them in place; that the nurse handed him her pen, with which he wrote his name quite imperfectly. The same witnesses testified that he read the deed in part, and that he said it was all right, and that he was glad to have it off his mind. The acknowledgment had been written in advance. This was signed by the notary after the signing by decedent. Formal delivery was then made. The notary handed the deed to Mr. Johnson, and Johnson handed the same to the wife. The testimony of Dr. Molison was that the decedent was suffering from cerebral hemorrhage; that since September 16th he was suffering from delusions; that his power of articulation was greatly impaired, and that his tongue and throat were affected; that one of the significant indications of cerebral hemorrhage was the involuntary bowel movements which the patient repeatedly and concededly suffered. All his testimony was substantially denied by Dr. Chesire, who testified that, since the coma of the earlier date, the patient's mind had cleared up; that he conversed intelligently with the doctor upon every visit; that he did not have cerebral hemorrhage, nor any delusion; that his speech was not impaired; that his involun-

tary bowel movements were not necessarily an indication of cerebral hemorrhage, but were an indication that the patient was a very sick man. The testimony of the nurses corroborated that of Dr. Chesire. They admitted, however, that much of the time the patient talked incessantly, and that they could not understand what he said; that such talking occurred when he slept or dozed or was delirious. Dr. Chesire knew nothing of the execution of the deed in question at the time thereof, nor at any time until after the death of the patient. He did say, as late as October 7th, to the attorney of the plaintiffs that the patient was not in a mental condition to do business. The best that can be said favorably to the defendant is that the evidence of mental capacity pro and con leaves the question very close and doubtful. If it can be said to preponderate in favor of the defendant, it is only in the sense that such capacity was as good as could be expected, in view of the severe illness. It was not a high degree of mental capacity. We shall not assume to speak definitely upon it. The crux of the case is upon the second proposition. The mental strength was at least greatly impaired by the physical ailment. Clearly, the patient was easily subject to being overreached by fraud, duress, or importunity. The burden was upon the defendant to prove that the transaction was fair, and that the free moral agency of the patient had full scope. The deed was obtained upon her initiative,—not upon his. If there had been a consideration, the question of its fairness would be involved. But the deed was a gift. This fact greatly increases the burden imposed upon the defendant. As an illustration of the rule obtaining in such cases, see *Curtis v. Armagast*, 158 Iowa 507, and cases cited therein.

It is a rare case where the dominant individual in a fiduciary relation can sustain a gift to himself by the one who is dependent upon him. Whereas the defendant had assisted her husband in his few matters of business before his illness, she had now, by his illness, become his sole dependence. If someone else had sought to obtain a conveyance of his property, she would have been his independent adviser, and would have protected him against ill advised action. Inasmuch as she became the beneficiary of this transaction, he was necessarily deprived of her help and advice. In such a case, equity inquires, Who

was his helper? Did he have any? Did he have independent advice, legal or otherwise? If his wish had been to refuse the gift, was there anyone to stand for him and to put forward the refusal? It is incumbent upon the defendant to make some answer to these questions. The burden is not met by showing simply that, at the time of the execution, he said that it was all right, or that he was glad of it. The same influence which induced the execution would likewise induce just such remarks. Underwood had been his legal adviser in another matter for the last three years. If Underwood had acted for him in this matter as his own independent legal adviser, it would have been an important circumstance in support of the deed. He did not do so. On the contrary, he acted upon the initiative of the defendant, and acted for and in the presence of the defendant. It must be assumed also that the decedent was liable to be influenced by Underwood to some extent, because of the fact of his intimate relation to him as his recent legal adviser. This influence operated to the aid of the defendant. If Underwood had conferred with the decedent as his own legal adviser, and had had opportunity to confer with him separately and apart from the donee, he would presumably have advised and protected him against unwilling or ill advised action. As it was in fact, the decedent was put at a greater disadvantage by the presence of Underwood than he would have suffered if Underwood had not been present at all. It appears that, on July 22d, Mr. and Mrs. Johnson appeared together at the office of Underwood, at Ames, to adjust the matter of an attorney's fee due to Underwood from Johnson. The defendant took occasion at that time to ask for a conveyance of this property. The decedent made an excuse, and she did not receive it. The evidence discloses that she had, for some time prior to the illness of Mr. Johnson, sought this conveyance, and sought the aid of others to get it. The fact that she had not been able to get it when he was in the enjoyment of his normal strength, and finally succeeded in obtaining the same only when he was *in extremis,* is in itself a circumstance which cannot be ignored. If the patient had finally recovered, and had brought this action in his own behalf to set aside the deed because of the circumstances under which it was obtained, it is hardly conceivable that a court of equity would deny him relief.

II.   One view to be considered in favor of the defendant is that this was the gift of a homestead from a husband to his wife.   Such a gift has *prima facie* a quality of reasonableness, and we have considered much whether it might be held that the reasonableness of this gift was so apparent that it was sufficient of itself to rebut the prima-facie case of the plaintiffs.   But reasonableness is a question of fact, and one of degree and circumstance.   Was it prominent and of great degree in this case?   The estate of the decedent amounts to between $45,000 and $50,000, including the property in question.   This property is worth $6,250.   The decedent had been married earlier in life, and had reared a family, and had become widowed shortly before his marriage to the defendant.   His estate was all the acquisition of the first marriage.   His surviving heirs were his four sons of his first marriage.   Each had done his part in the acquisition of the estate.   The father had never distributed to his children any part of the estate.   There is evidence in the record that, shortly prior to the making of the deed, he had declared his wish and purpose that his then wife should take one third of his estate, and no more, and that the rest should go to his sons.   If this was his wish and purpose, was it any less reasonable than would have been a wish to give his wife more than her statutory third?   To her credit be it said that she cared for him affectionately in his illness, and that their married life had been affectionate.   The defendant knew, when she married the decedent, that his natural expectancy of life was brief, and she knew his approximate estate.   There were no children of the marriage.   She has no dependents.   She obtained no antenuptial agreement.   She has her own independent property.   She has always been assured one third of the estate and a year's allowance and the privilege of administering the estate, of which privilege she has availed herself.   The effect of this deed, if sustained, would be to give to the defendant, directly and indirectly, fully one half (perhaps more) of this estate.   If she had been the mother of the decedent's children, or perhaps if her legal distributive share were not an adequate reward for her devotion to the decedent, or if it were not sufficiently large to enable her to include the homestead therein by

*(margin note: 2. FRAUDULENT CONVEYANCES: evidence: relation and situation of parties.)*

election, it would, in either event, put a somewhat different phase upon the question of reasonableness. But the mere fact that the donee was the wife of the donor is not, of itself, a sufficient circumstance to overcome the prima-facie case.

True, the law makes no distinction in the *right* of the distributive share of the wife, whether she be the wife of a lifetime or the wife of a day. It is a hard saying, but a true one, that the wife of a lifetime, who has mothered and reared the children of the marriage, and who has contributed her life effort to the acquisitions of the family, if she predecease her husband, dies destitute, leaving no moiety to the children she has borne. Her only dying consolation in such a case is the hope that her children may ultimately receive the fruits of her life, through inheritance from their father. If there be a later bride, *she* has cast upon her the full endowment, ready made, which her predecessor had earned in life and lost by death. The line of inheritance between children and mother and between children and father as well is to that extent broken. It is the quintessence of legal irony that the first wife, who, during her life, had the inchoate right of dower in all her husband's estate, could pass nothing therefrom at her death to her children, but must pass it all to her successor at the altar. Such was the common law, and such is our statute. The *civil law* was wiser at this point and more just, in that it awarded and still awards to the children of the dead wife the moiety of the mother in the father's estate. We make this observation, not for the purpose of finding fault with the law as it is, but as bearing upon the question of the reasonableness of a conveyance of gift from husband to wife. Such a conveyance might in one case appear to all minds reasonable and compelling, and might not at all appear such in another. In weighing the evidence on the question of fraud and undue influence, a court of equity will not depreciate the existing marital relation, nor minimize the full legal rights of the wife, as such. But if she claim to be the recipient of bounty conveyed to her by her husband under circumstances of disability and dependency, the court must consider all the circumstances surrounding the grantor, as bearing upon the motives which would ordinarily and naturally and probably influence him in the disposition of his estate; and for

that purpose, it cannot wholly overlook the large morality underlying the claims of his children upon his bounty, as the sole representatives, not only of himself, but also of the dead and unrequited mother. He had, it is true, a legal right to disregard these claims. But it will not be lightly presumed that he did so. The plaintiffs having made a prima-facie case, the burden is shifted to the defendant. The circumstances here indicated are a counterweight against her burden of proof.

It should be noted here that, in 1916, just before the decedent's marriage to defendant, these plaintiffs instituted guardianship proceedings against their father. These proceedings failed. It is proper argument for the defendant to urge that he wished to penalize his sons for their conduct in this proceeding. The weight of this circumstance, however, is greatly diminished, if not eliminated, by the fact that for the three years of his normal strength he had refrained from such a course. If he yielded to it at last only when he was too weak and dependent to resist suggestion and importunity, it furnishes little aid to defendant. On the contrary, it may have become a part of the pressure which was brought to bear upon his weakness.

It is our conclusion that the burden of proof cast upon the defendant has not been met, and that, therefore, the deed cannot be sustained. There will be a decree for plaintiffs, and the decree entered below must, accordingly, be reversed.—*Reversed and remanded.*

PRESTON, C. J., WEAVER, STEVENS, ARTHUR, and DE GRAFF, JJ., concur.