JOHN F. KALSEM, Appellant, v. RUTH FROLAND et al., Appellants; HANS FROLAND et al., Appellees.

November 20, 1928.

Rehearing Denied March 8, 1929.

*Lee, Steinberg & Walsh* and *Harry Langland,* for appellants.

*Welty, Soper & Welty,* for appellees.

Evans, J.—I. The deceased wife of the plaintiff was formerly the wife of Nels Froland, whom she married in 1907. Froland was at that time a widower, with nine children, and was

the owner of property to the value of $25,000, including the farm of 173 acres upon which he lived. Prior to the marriage, the parties entered into an antenuptial contract, and upon this contract the controversy turns. Such contract was the following:

"We, the undersigned, agree to marry each other on the following condition: I, Nels Froland, agree to marry Ragnhild Helgevold, upon her agreeing as follows to wit she agrees that the children that I, Nels Froland, now have, is hereby adopted by her as her own; that said children shall have the same right of inheritance in her property at her death, as if they were her natural born children; that she will act as a dutiful and loving mother to said children; that her right in my property shall be the same as is now recognized between husband and wife under the laws of Iowa; that in case of separation granted by any court on petition of Ragnhild Helgevold, her interest and property right in the property that I now own together with her right in the children, shall be at an end; and that alimony shall not be allowed her on application by her for separation if such be the case; that at the time of my death if she survives me this contract shall be filed for record, that for the faithful performance of the duties specified in this contract, a lien is hereby created against Ragnhild Helgevold's interest in my property both real and personal, and to remain as a lien until released by the children; that is to say in case she survives me.

"Nels H. Froland.

"I, Ragnhild Helgevold, bind myself to this contract and declare to and accept said terms, in consideration that Nels Froland marry me.

"Ragnhild x Helgevold.

"Witnesses to this contract:
"Rev. H. J. Holman
"Gertie H. Richardson

"Under the terms in the foregoing contract we were married this 6 day of March A. D. 1907."

Two children were born as the fruit of this marriage. In 1910, Froland died, survived by his wife and eleven children. Administration of his estate was had, and his widow received her widow's share, including exempt property and temporary sup-

port. In 1920, the widow married the plaintiff herein. One child, Marion John Kalsem, named as defendant herein, was the fruit of this marriage. Ruth and Lillian Froland, named as defendants, were the surviving daughters of the deceased, and the fruit of her first marriage. These three defendants here named, by cross-petition claimed all the residue of their mother's estate, to the exclusion of the stepchildren. The appellants challenge the validity and efficacy of the antenuptial contract on the following grounds:

"1. The same was one-sided, unfair, and unconscionable.

"2. The same was drawn to protect fully the interest of Nels Froland, but contained no provision whereby the interest of Ragnihild Kalsem was protected.

"3. The contract provided that the children of Nels Froland should inherit from the said deceased, but did not provide that she should inherit from said children.

"4. The same attempted to effect an adoption in a manner contrary to the requirements of the statute.

"5. The said contract expressly provided that, regardless of the treatment that the deceased should receive from Nels Froland, she could only apply for a divorce or a separate maintenance at the peril of forfeiture of all her earnings, or forfeiting all her rights under the marriage in the property of Nels Froland, and forfeiting the rights to alimony, suit money, separate maintenance, and her rights in the children.

"6. The deceased, Ragnihild Kalsem, was young, inexperienced, and unacquainted with American customs, laws, and legal rights of a married woman, and did not understand said contract; and if said contract is to be interpreted as an attempt to adoption, the same is void because no legal steps were ever taken whereby the answering defendants were in fact adopted, and whereby the deceased acquired any legal rights to the service of the answering defendant, or the custody, or acquired any right to inheritance from them; and, the consideration having failed on the part of the answering defendants, it would be inequitable to enforce the contract in their behalf."

They also challenge the same as ineffective as an article of adoption on the ground that it did not conform to the requirements of the statute for the purpose of adoption.

The parties to the contract were natives of Norway. At the time of her marriage, the wife had been in this country two years, and had worked in the Froland family as a domestic for one year. She was 27 years of age, and he was 49 years. The contract was reduced to writing, both in English and Norwegian. Both the English and Norwegian copies or duplicates were signed. The contention that there was no consideration for the contract in the form in which it was drawn, cannot be sustained. The marriage itself was a good and sufficient consideration. There was no fraud or concealment of any kind as an inducement to the contract. Though the wife at that time was not versed in the English language, she was versed in the Norwegian language. She declared her understanding of the provisions of the contract, and adhered to them throughout her life. After the death of Froland, she delivered the contract temporarily to the administrator of his estate, to be recorded and returned to her. It was thus recorded and returned to her the same day. This recording was requested by her because she deemed it essential to the protection of her stepchildren. The circumstance indicated a purpose on her part to fully confirm the contract. Neither during the life of her husband nor at any time thereafter did she ever purport to repudiate any feature of the contract. The rights of her heirs can rise no higher than her own. Her lifelong attitude toward the contract, therefore, must be considered in passing upon some of the grounds of attack urged by the appellants.

It is urged that the contract was unconscionable. She never regarded it so. When it is considered that she was a person without any means, and that by her marriage she acquired an inchoate right of dower in a valuable farm, this ground of attack is not persuasive. True, she assumed the heavy responsibility of mothering nine children. True, also, such a service has moral values which cannot be computed in dollars; yet she came also into the privilege of a highly useful and noble life. She had lived with the family for a year before she entered into the contract, and the tendrils of affection for the children which had begun before the contract and the marriage never lost their hold upon her in the after years, nor upon the children whom she had mothered. In short, the fact that she was knowingly entering upon an arduous life is not a reason for saying that the contract

was unconscionable. There are other considerations. The father and mother of these children had acquired this property by their joint labors. If, after the death of the wife, while the property was all held in the name of the husband, he should yet deem himself under obligation to protect such wife's children in their inheritable rights to the joint property of father and mother, equity will impose no condemnation on such a motive. *Johnson v. Johnson,* 196 Iowa 343.

It is strenuously argued that the contract was void because it lacked mutuality. The point here is that there was no provision in the contract whereby the stepmother should inherit from the stepchildren, in case of the death of any of them. Whether the contract should or could be construed so as to give to the adopted mother the right of inheritance from her stepchildren, on the theory of adoption, is a speculation which can never be settled. Likewise, the question whether such a proviso could be effective. She survived none of them. Moreover, the question of mutuality can be controlling only to the extent that it destroys consideration. In this case, the consideration of marriage was specified, and was adequate. The contract is criticized also because of a certain provision therein purporting to forfeit the rights of the wife if she should file petition for divorce. If this provision was void, and against public policy, as contended by appellant, and as we think, then in what respect did it affect the consideration proposed to and received by the wife? Notwithstanding that the husband took nothing under this provision, and gave no right thereby, he was yet bound by the valid provisions of the contract. Why, then, should an absence of obligation to conform to an invalid provision of the contract be deemed a release from the obligations of its valid provisions? This provision in question also became a dead letter. The marriage proved a happy one, and no proceeding of divorce was ever instituted or threatened.

We are firmly of the opinion that this record would not warrant a finding that the contract in its essential features was unfair, unconscionable, or lacking in mutuality, or against public policy.

II. It remains to consider the terminology of the contract and the scope and effect thereof. The contract provides:

"(1) She agrees that the children that I, Nels Froland, now have, is hereby adopted by her as her own;

"(2) That said children shall have the same right of inheritance in her property at her death, as if they were her natural born children."

It is argued that no legal adoption was ever had, and that, therefore, this feature of the contract must fail. It is to be noted that the contract does not contemplate other proceedings  of adoption than the contract itself. We have often recognized a common parlance of the lay world, which often uses legal terms in other than a legal sense. The word "inherit" is often so used, and is given effect by the courts in its popular sense, and distinguished from its strict legal meaning. It is clear that the word "adopted," as used in this contract, is used in its popular, rather than in its legal, sense. The real meaning of Clause No. 1 comes forth clearly in Clause No. 2. When these two clauses are read together, the meaning of the contract stands forth clearly. The really essential feature is all contained in Clause No. 2. Clause No. 1 could be eliminated, without affecting the meaning of the contract. The two clauses distinctly undertake that the nine children of the husband shall take a child's share in the property of the wife at her death, precisely as though she were their mother, and they her natural children. Contracts for inheritance have been too frequently sustained to require special discussion at this point. The principal property in controversy here is the Froland farm of 173 acres. We discover no reason, upon this record, why the contract before us should not be given effect according to its plain intent. This was, and is, that, for the purpose of distribution of her estate, this wife should be deemed the mother of nine stepchildren, and that each should take a child's share in her estate.

The district court so held, and its decree is, accordingly,— *Affirmed.*

STEVENS, C. J., and FAVILLE, KINDIG, and WAGNER, JJ., concur.