IN RE ESTATE OF CHARLES A. PARISH.

P. H. PAULSEN, Administrator, Appellant, v. JESSIE A. PARISH, individually and as executrix, Appellees.

No. 46704.

OCTOBER 16, 1945.

DeWolf & DeWolf, of Reinbeck, P. H. Paulsen and McCoy & Beecher, all of Waterloo, for appellant.

C. M. Parker, of Cedar Falls, and Pike, Sias & Butler. of Waterloo, for appellees.

MANTZ, J.—  On June 29, 1937, Charles A. Parish, aged eighty-four, of Cedar Falls, Iowa, and Fannie Belle Shreeve, aged seventy-six, of Alberton, Montana, were married at Reinbeck, Grundy County, Iowa. Following the marriage the parties lived at Cedar Falls, Iowa, where the husband died June 3, 1943, leaving his widow, applicant herein, who died April 28, 1944. This was the third marriage for Mr. Parish and the second for Mrs. Parish.

The parties first met about the year 1935, the occasion being a visit by Mrs. Shreeve to Cedar Rapids, where she was introduced to Mr. Parish by his wife, Ida Parish, an old and intimate friend of Mrs. Shreeve. Mrs. Shreeve returned about a year later intending to visit Parish and his wife but was informed by the former that the wife, Ida, had died a few days previously. Shortly thereafter Mrs. Shreeve returned to her home in Montana. Following this, Parish and Mrs. Shreeve corresponded and about six weeks later, by such means, became

engaged. She came to Cedar Falls on June 29, 1937, and went with Parish to Grundy Center, Iowa, and they there secured a marriage license and were married later in the day.

Charles A. Parish died testate. His will was dated in 1928 and therein he devised to a sole surviving child, a daughter, Jessie A. Parish, substantially all of his property. To this will he made a codicil on May 4, 1943, wherein he devised to his wife, should she survive him, the sum of $50 per month as long as she lived and at her death $100 on her funeral expenses. The will and codicil were admitted to probate on June 18, 1943. Jessie A. Parish was appointed executrix and has since acted in that capacity.

On July 31, 1943, the widow applied to the court for the admeasurement of her distributive share of the estate of Charles A. Parish. This application was resisted by Jessie A. Parish, as executrix and also as an individual. She alleged that the widow was not entitled to the share claimed by her in that prior to the marriage of Charles A. Parish and Fannie Belle Shreeve the parties entered into an antenuptial contract wherein their property rights were determined and fixed. The claim of the executrix was resisted, applicant alleging that the so-called antenuptial contract between Charles A. Parish and Fannie B. Shreeve was in fact a postnuptial agreement, being entered into after the marriage; that same was not binding upon applicant in that at the time entered into a confidential relation existed between her and Charles A. Parish; that she knew nothing of the nature and extent of his property rights; and that the same was grossly unfair and inequitable and that by reason thereof it was not binding upon her and that she is entitled to her full distributive share as the widow of Charles A. Parish. The pleadings are quite voluminous and cover fifty-one pages of the record. However, in essence, they relate to the matters above set forth.

I. The decree of the trial court was filed March 30, 1944. It denied the claim of the widow and dismissed her application. Applicant died April 28, 1944. To prosecute this appeal, her administrator, P. H. Paulsen, was substituted.

The resistance to the application was carried on by Jessie

A. Parish, executor of the Charles A. Parish estate, and also by Jessie A. Parish as an individual. Hereinafter Jessie A. Parish will be referred to as the appellees, and the applicant, Fannie B. Parish and her administrator, P. H. Paulsen, will be referred to as the appellant.

As before stated, by agreement of the parties the cause was tried in equity. Because of some questions raised on this appeal as to the procedure, and particularly as to the burden of proof, we will briefly outline the procedure followed at the trial below:

1. The appellant established her marriage to Charles A. Parish, his later death, and rested.

2. Appellees offered the antenuptial contract between Charles A. Parish and Fannie Belle Shreeve, the execution and signatures to which were admitted, and rested.

3. Appellant then offered evidence to support her claim that such contract was executed after the marriage, and again rested.

4. Appellees then offered rebuttal testimony to further establish that the contract was executed prior to the marriage and was free from fraud and deceit, and again rested.

The major controversy in the case revolves around the question whether the contract entered into between Charles A. Parish and Fannie B. Shreeve was executed before or after their marriage.

The trial court held that the record showed that the parties entered into the contract, Exhibit N, before they were married.

II. The preamble to the instrument recites the residence of the parties; the contemplated marriage; that C. A. Parish has an estate and children by a former marriage, and that Fannie Belle Shreeve possesses property in her own right; and that the parties to the contract desire to limit and determine the interest and control which each of said parties may have in the estate of the other during the marriage relation.

It further provides that in the event of the death of C. A. Parish, his wife surviving him, then the widow should receive $5 from his estate, to be paid by the administrators, and that this sum was to be in full of all claims and demands of every kind and character which the widow would have against the

estate, the same to cover distributive rights therein and right of inheritance.

On the other hand it was provided that should C. A. Parish survive Fannie Belle Shreeve, and the latter should die during the marriage relation, the amount which C. A. Parish could claim from her estate would be limited to $1 and that was to be in full of all claims which he might have as husband or widower, including distributive rights and the right of inheritance.

It further provided that during the continuance of the marriage relations contemplated by the contract each party was to have full, complete, and perfect right to control and dispose of his or her separate property as if no marriage existed, and that each would have a right to dispose of and sell any or all real or personal property owned or hereafter owned without the other party joining.

The contract further sets forth the purpose and intent of the agreement, which was to fully, perfectly, and completely define and limit the claims and demands which each of the parties to the contract would have against the estate of the other, and that should either party die during the pendency of the contract, or should the contract be determined by legal proceedings, the claims herein stipulated and defined would be the limit which either party might have against the estate of the party dying.

The following paragraph of the contract is set out verbatim:

"This agreement is made and entered into with full knowledge upon the part of the parties hereto that each of the parties have a separate estate and no claim or demand can be predicated upon the fact that there has been any misrepresentation or concealment as to the amount and condition of said separate estate, it being expressly agreed and understood that each of the parties at this time consider the amount hereinabove fixed to be sufficient participation in the estate of the other, and I, Fannie Belle Shreeve, having this day received from the said C. A. Parish a substantial sum of money, consider the provisions herein made for me sufficient for my support and maintenance, each of said parties stating that they have a sufficient general knowledge of the condition of the estate of the other to justify them in making and entering into this agreement."

We will first take up and consider the evidence bearing upon the question as to when the marriage contract was entered into. Other questions will be considered later.

III. That the parties were married at Reinbeck, Iowa, on June 29, 1937, is not in dispute. That a contract dealing with the property rights which would grow out of the marriage relations between the parties was entered into is not in dispute.

The contract was prepared by R. J. Williamson, an attorney, in his office at Grundy Center, Iowa, and it bears the date of June 29, 1937. It bears the signatures of C. A. Parish and Fannie Belle Shreeve. It was acknowledged before W. L. Mooty, an attorney, of Grundy Center, who officed with R. J. Williamson. The acknowledgment bears no date, it having no place thereon for a date. The record shows that R. J. Williamson had practiced law at Grundy Center for forty-seven years. He bore a reputation of ability and integrity of a high order. When the case was tried his evidence was not available, due to his death, which took place August 26, 1943. He was then eighty-seven years of age. W. L. Mooty, who took the acknowledgment to the contract, was in the armed services at the time of the trial and his evidence was procured by deposition.

Mrs. Parish, the widow, testified that the contract was entered into on June 30, 1937, the day following the marriage ceremony. She was eighty-four years old when she testified and there are in the record things which indicate that due to her age her memory as to what really took place about the time of the marriage was not entirely trustworthy. Much of her testimony as to that event cannot be considered, due to her incompetency under what is known as the "dead man statute" [section 11257, Code, 1939].

She testified that following the marriage on June 29, 1937, she and her husband at once returned to his home in Cedar Falls, where they remained for the night, and that they returned to Grundy Center the day following (June 30th), and that it was on this latter date she signed a paper which was presented to her and which she thought was a conveyance of a life lease in and to some of her husband's real estate. No witness corroborates appellant's claim that she and her husband returned to Grundy Center on June 30th. Appellees objected to all of the testi-

mony of appellant as to the trips to Grundy Center and the incidents thereof on the ground of the incompetency of the witness under the dead man statute and they did not cross-examine her on any such testimony.

Appellant's claim is based largely upon the testimony of four persons: Leo Bailey and his son, Ralph Bailey, who went with Mr. Parish and Mrs. Shreeve to Grundy Center, where the former aided the prospective bride and groom in securing a marriage license; also that of O. R. Jones, the officiating minister, and his wife, Rosa, together with various inferences arising therefrom. The minister lived at Reinbeck, a town in Grundy county some eight to nine miles from Grundy Center. Leo Bailey, a farmer, lived five miles from Grundy Center. He testified that he had known Parish and Mrs. Shreeve for years; that they came to his home about one p. m., June 29, 1937, and asked him to go to Grundy Center to identify them in securing a marriage license; that about one and a half hours later, riding in his car, he followed Parish and Mrs. Shreeve to Grundy Center and went to the courthouse and acted as a witness in getting a marriage license, after which they got in the Parish car and "presumably" drove to Reinbeck, after saying they were going there to be married. Ralph Bailey, son of Leo Bailey, testified that Parish and Mrs. Shreeve came to the farm home; that he drove his father to Grundy Center, saw his father and the couple enter the courthouse and leave it between two and three o'clock, when Parish and Mrs. Shreeve got in the Parish car and started east; that they were still in Grundy Center when he last saw them.

O. R. Jones, the minister, said that Parish and Mrs. Shreeve came to his home in Reinbeck and that he performed the marriage ceremony about five p. m. His wife, Rosa, who was one of the witnesses, thought the ceremony took place between four thirty and five o'clock.

All of the events testified to by these four witnesses took place on June 29, 1937, about seven years prior to the time they gave testimony in court.

It is argued by appellant that the marriage contract could not have been signed on June 29th, by reason of the time re-

quired to do so; and he has Parish and Mrs. Shreeve at the Bailey home (five miles from Grundy Center) at one p. m.; their leaving the Baileys for Grundy Center from an hour to an hour and a half later and going directly to the courthouse, where a license was secured; their leaving the courthouse about three p. m., announcing that they were going to Reinbeck (eight to nine miles distant) to be married, getting into the Parish car and driving eastward in the town; their arrival at the minister's home between five and six o'clock; and their going directly to Cedar Falls after the marriage.

Appellant argues that it was an impossibility to have had prepared and signed the marriage contract and to have gone through the process of securing a witness, securing the license, and going to Reinbeck to be married, all on June 29, 1937. In support of this claim appellant calls attention to the testimony of W. L. Mooty, the notary, wherein he mentions the time the marriage contract was signed: "They [signatures] were affixed at approximately 5:00 p. m." This is in direct conflict with the testimony of Minister Jones and his wife.

Appellees argue that the marriage contract was executed before the marriage. They argue that the record contains ample evidence to support such claim.

Appellant admitted that she signed the marriage contract. It bears the name possessed by her prior to the marriage— Fannie Belle Shreeve. She admitted her signature to that instrument. The instrument bears the date June 29, 1937. Its heading is "Ante-Nuptial Contract." Its preamble states that the parties, C. A. Parish, of Cedar Falls, and Fannie Belle Shreeve, of Alberton, Montana, "contemplate entering into marriage relations * * * ." Later the instrument, naming the parties and their residences, states "* * * being about to enter into the marriage relations * * *." Later is found therein the statement, "During the continuance of the marriage relations herein contemplated * * *."

W. L. Mooty, the notary who took the acknowledgment, testified positively that the marriage contract was prepared by Attorney Williamson, by writing in longhand and then being typed by a stenographer, and after being typed was read over and explained by Mr. Williamson to C. A. Parish and

Fannie B. Shreeve, and they were asked if they fully understood it and were ready to sign; that they said they did, and thereupon signed it in his presence, and the acknowledgment was then taken by oath administered by the notary. A copy was given to the parties thereto, and they then said in the presence of Attorney Williamson and W. L. Mooty that they were going to get married, and left the office.

The parties stipulated that, if present, L. A. Moser, editor and publisher of the Reinbeck Courier, of Reinbeck, would testify that between the hours of five forty-five and six p. m. on June 29, 1937, Charles A. Parish drove his car through an alley alongside the newspaper office in Reinbeck and came to the office, leaving a lady in the car, and stated that he had just left the Jones parsonage where he had been married.

There were other facts in evidence which had a tendency to throw light upon the controversy, but the ones above set forth are the most important.

The trial court held that the contract between Charles A. Parish and Fannie Belle Shreeve was a valid antenuptial contract and as such was binding upon the parties. With this finding we concur.

IV. Such contracts are considered the same as other contracts and are established by a preponderance of the evidence. It is one of the purposes of antenuptial contracts to protect the interests of children by former marriages. In re Estate of Dolmage, 204 Iowa 231, 213 N. W. 380; In re Estate of Newson, 206 Iowa 514, 219 N. W. 305; Johnson v. Johnson, 196 Iowa 343, 191 N. W. 353; In re Estate of Hubinger, 150 Iowa 307, 130 N. W. 155; Kalsem v. Froland, 207 Iowa 994, 222 N. W. 3.

Antenuptial contracts are looked upon with favor by the law and are to be liberally construed to carry out the intentions of the parties. The purpose of such contracts is to fix the interests of the respective parties in the property of the other. In re Estate of Hubinger, supra; In re Estate of Thorman, 162 Iowa 316, 144 N. W. 5; Cummings v. Wood, 197 Iowa 1356, 199 N. W. 369; Finn v. Grant, 224 Iowa 527, 532, 278 N. W. 225, 228. In Finn v. Grant, supra, this court said:

"An agreement of this kind is valid and operates to extinguish the homestead right of either in the property of the other." (Citing cases.)

If an antenuptial contract is not unfair, inequitable, or unconscionable on its face, and there has been no fraud or overreaching or deceit practiced in its being obtained, it should stand. This question is to be determined from the contract and any facts and circumstances in evidence. In such a case the burden is on the party claiming the invalidity of the contract. Rankin v. Schiereck, 166 Iowa 10, 147 N. W. 180. When an antenuptial contract is apparently unjust and unreasonable, the burden of proof is cast upon those claiming under the husband to show that the contract was fairly procured. Fisher v. Koontz, 110 Iowa 498, 80 N. W. 551; In re Estate of Thorman, supra, 162 Iowa 316, 144 N. W. 5. The Thorman case holds that the subsequent marriage of the parties to an antenuptial contract is sufficient consideration. Nesmith v. Platt, 137 Iowa 292, 114 N. W. 1053; In re Estate of Adams, 161 Iowa 88, 140 N. W. 872.

The marriage between the contracting parties to an antenuptial agreement is a good and sufficient consideration. Kalsem v. Froland, supra; In re Estate of Shepherd, 220 Iowa 12, 19, 261 N. W. 35, 39. In the last-cited case this court, Hamilton, J., said:

"Antenuptial contracts of this character are valid, binding, and enforceable, and are based upon the consideration of marriage, which is looked upon by the courts as of the very highest known to the law." Citing Veeder v. Veeder, 195 Iowa 587, 192 N. W. 409, 29 A. L. R. 191; Fisher v. Koontz, supra, 110 Iowa 498, 80 N. W. 551; In re Estate of Mansfield, 185 Iowa 339, 170 N. W. 415.

In construing antenuptial agreements there is to be considered the intention of the contracting parties, their status as regards ages, former marriages, children from such marriages, the property of the contracting parties, and their intentions in entering into such agreement. Ditson v. Ditson, 85 Iowa 276, 52 N. W. 203; Corbett v. Berryhill, 29 Iowa 157.

Antenuptial agreements are favored by public policy as conducive to the welfare of the parties and the best purposes of the marriage relationship, and to prevent strife, secure peace, adjust rights, and settle the question of marital rights in property. 26 Am. Jur. 883, citing Veeder v. Veeder, supra, 195 Iowa 587, 192 N. W. 409, 29 A. L. R. 191.

An antenuptial contract is in the same category as other contracts and is controlled by the same rules as other contracts if fair on its face and free from fraud. Cummings v. Wood, supra; In re Estate of Uker, 154 Iowa 428, 134 N. W. 1061; Rankin v. Schiereck, supra; In re Estate of Devoe, 113 Iowa 4, 84 N. W. 923; Lungren v. Lungren, 197 Iowa 519, 197 N. W. 646; Peet v. Peet, 81 Iowa 172, 177, 46 N. W. 1051, 1052; In re Estate of Shepherd,. supra.

In the Peet case both parties had been married before. Contemplating marriage, Peet had an antenuptial contract prepared, which recited that in the event the parties married each relinquished any claim to the property of the other; that if the wife survived she was to receive interest on the sum of $3,000 as long as she lived. The husband had children by a former marriage. When he died he had an estate of $50,000 or more. Mrs. Peet had no property when she married Mr. Peet. Following his death, the widow, Mrs. Peet, claimed her dower or distributive share of his estate, and, while admitting that she had signed the contract, claimed ignorance of its contents, and that it was unfair and inequitable and should not be enforced. This court, in upholding the trial court in denying her claim, said:

"It is argued that the agreement is so illiberal in its provisions for the support of appellant as to evidence that she acted under undue influence in executing it, and that it is so unreasonable and unconscionable that it should not be enforced. It cannot be said that the provision for Mrs. Peet's support is liberal, and yet it was such an agreement as the parties were at liberty to make, and as the law will sustain when fairly made. Appellee urges that it was not illiberal, because it does not bar appellant of her rights in the personal assets of the estate. As this question only arises incidentally, and all the legatees are not parties to this action, we do not pass upon it.

"In view of all the circumstances, we do not think the agreement is so unreasonable as to show undue influence. Mrs. Peet had not contributed to the accumulation of the estate, and was not likely to aid in its enhancement. She was without a home, or means of support of her own, except her earnings. Her ability to earn a living would decrease with increasing years. By this agreement, and marriage, she was assured of a home, support and companionship with the man of her choice, and the interest on three thousand dollars after his death, so long as she remained his widow. Meager as this provision is, yet it was reasonable that in her circumstances she should be willing to accept it. The circumstances did not call for special liberality on the part of Mr. Peet. It was reasonable that he should desire that no part of his estate should pass to strangers, through his wife, to the prejudice of his children. While a more liberal provision for appellant's support would meet with ready approval, we cannot say, upon the record, that Mrs. Peet was induced to execute the agreement by undue influence, or in ignorance of its general effect, nor that it is so unconscionable that it should not be enforced."

In Rankin v. Schiereck, supra, 166 Iowa 10, 12, 147 N. W. 180, the plaintiff, Nancy E. Rankin, brought suit to establish her claim of dower in certain real estate as the widow of A. W. Rankin. The defense was an antenuptial contract waiving such right. The contract is as follows:

"This contract this day entered into between A. W. Rankin and Nancy E. Emanuel, both of Davis county, Iowa, witnesseth: That the said parties have this day mutually agreed to marry and become husband and wife according to law, and it is hereby agreed by the parties to this contract that each of them is to retain his or her own property free from the claim of homestead or dower or other interest commonly given by law to parties becoming husband and wife, and, in case of the death of either or the dissolution of the marriage relation, the property and effects, both real and personal, of each shall belong to the respective parties to this contract, and shall descend according to law to the heirs of each, or be disposed of by will

as fully as though no marriage relation ever existed between said parties. Dated and signed this 4th day of December, 1901, at Bloomfield, Iowa. [Signed] A. W. Rankin. Nancy E. Emanuel."

Mrs. Rankin admitted signing the contract but said it was not binding in that prior to signing it she had never seen it; that she signed it at the request of A. W. Rankin and that its contents were not made known to her at the time; that there was no disclosure to her of its purpose and that she was not advised of the effect it would have upon her rights; that her signature was secured by fraud, concealment, and bad faith; that she signed the same under a mistaken idea of its contents and that it was signed at a time when a confidential relation existed between her and A. W. Rankin. This court discussed the evidence, and said, at page 20 of 166 Iowa, page 183 of 147 N. W.:

"From the whole record, which we have carefully read, we reach the conclusion that Mrs. Emanuel [Mrs. Rankin] knew of the terms of the marriage contract, freely entered into it, uninfluenced by fraud or deceit, and that we have not the right to say that it should not be binding." Citing Peet v. Peet, supra.

In Jacobs v. Jacobs, 42 Iowa 600, 607, the claim was made that the antenuptial contract was without consideration and was unreasonable. Both parties had previously been married and had living children. The husband had about $12,000 in real estate; the contemplated wife had forty acres of land and about $800 in money. The widow claimed that in equity such contract should not be enforced. In denying this claim, this court said:

"The law always looks upon marriage as a civil contract, and this marriage seems to have been purely a business transaction. So far as appears, the contract was freely and voluntarily entered into, without any fraud or imposition. * * * They were willing to marry, but each wanted the sole control of his or her own property and to transmit it to his or her children. * * * We know of no reason why it should not be enforced."

This court, in the Jacobs case, further stated that the court had adopted certain rules of construction in such contracts, with the primary purpose of arriving at the meaning and intent of the parties, and in so doing, the situation of the parties and of the property and the purpose of the parties in the making of the contract must be considered. Citing Field v. Schricher, 14 Iowa 119; Foley v. McKeegan, 4 (Clarke) Iowa 1, 66 Am. Dec. 107.

V. With these rules in mind, let us examine the record.

There is nothing on the face of the contract to indicate that it is unjust or unreasonable. It was one the parties had a right to make. Briefly, it provided that in the event of a marriage each party was to control his or her property as desired. She admitted that she signed the contract when it was presented to her, and such being the case, and the contract not being unjust or unreasonable on its face, she would have the burden of showing its invalidity.

There is nothing in the record to indicate that Parish sought to cover up or conceal from her the nature and extent of his property. She had known him for at least two years and had visited in the community where he lived, and we think it fair to infer that she was in a position to know something of his property. She testified that they became engaged by correspondence; that she had some of his letters but that they were in Montana. She knew that Parish had a comfortable home in Cedar Falls and as his wife she would have a rightful place therein, with the ensuing support and maintenance. She and her former husband had lived in various places in Iowa for many years and were always farm tenants. For some time prior to 1937 Mrs. Shreeve had lived in humble circumstances in Montana, owning a small home with a value not in excess of $500; for some years her main income had been an old-age pension of $15 per month. Prior to his death, she and her husband lived upon three hundred acres which her husband (Shreeve) had homesteaded. This land was worthless, was abandoned, and reverted to the government. In order to enable her to come to Iowa and be married Parish sent her money to

apply on such expense. He also sent her a $1,000 bond, which she later cashed and put in her own bank account. Both parties had been previously married and each had living children. A large part of the property owned by Parish at his death came to him by inheritance from a deceased wife, the mother of Jessie A. Parish. It would be but natural that Parish would desire to protect his child in her inheritance.

Parish and applicant lived together nearly six years and the record shows no complaint or dissatisfaction concerning the property arrangement. The contract was kept in a lock box at ·the bank and the record shows that applicant· had access to it.

Possibly Parish could have been more liberal in the contract, but it is not for us to say that he was legally bound to do so. As showing concern for his widow, he made a codicil to his will giving her $600 per year following his death, and $100 to be applied on her burial expense. This was in excess of three times what she was getting in Montana. She has been granted a widow's allowance in his estate of $1,500. All told, she received from Parish and will receive from the estate a sum total in excess of $3,000. Looking at the situation from a purely financial angle, Mrs. Shreeve gained by the marriage. She obtained a good home, was assured the comforts of old age, and was thereby relieved of the worries and anxieties which go hand in hand with poverty and old age. There is nothing in the record to indicate that Parish was derelict in his duties to her as a husband.

These parties were past their earning years and could not expect to ·add to their holdings to any extent. We find no fraud in the record. Needless to cite cases in support of the rule that fraud is never presumed. The contract was prepared by a lawyer of unimpeached character; his probity and integrity stand unquestioned. The record shows that he spent considerable time in preparing the contract, doing this by longhand. Following its being typed in final form he (Williamson) went over it in detail with Parish and Mrs. Shreeve. To his inquiry if they understood it and if it was satisfactory they both answered in the affirmative. W. L. Mooty, an attorney of standing, testified that he was present when Parish and Mrs. Shreeve had the

contract explained to them by Mr. Williamson; that they agreed to its terms and said that it was satisfactory. Thereupon Mooty took their acknowledgment by formal oath and signed as a notary, retaining one copy and giving Parish the other. Following this, Parish and Mrs. Shreeve stated that they were leaving to be married.

If we were to accept the word of appellant that she came to Grundy Center the day following the marriage and then signed the contract and under conditions amounting to fraud, deceit, and overreaching, we would have to conclude that Parish was deliberately taking advantage of the woman he was marrying, and further, that in so doing, he had the active aid and cooperation of two members of the legal profession. This the trial court refused to do and we fully concur in such action on the part of the court.

VI. Appellant herein has argued at length that appellees have the burden of showing the validity of the contract, and asserts that the evidence shows the same to be so unfair, unjust, and unconscionable that a court of equity should not enforce it. On the other hand, appellees argue that inasmuch as Mrs. Parish admitted that she signed the instrument when presented to her, having challenged its validity, she has the burden of so showing.

Regardless of which had the burden, we think the evidence fully sustains its validity. In re Estate of Uker, supra. Taking the contract by its four corners, and examining its provisions, and considering also the evidence as to its execution, the intentions of its makers, their relationships, their then status, their ages and family background, we do not think that any other conclusion can be drawn than that the signers entered into the contract fully aware of its contents and of the legal effects thereof. They had a right to enter into such a contract and there can be no doubt that both desired to do so. This court is not in a position to make another contract for them.

Other questions have been argued, such as the extent of the property which Parish owned at the time of his death, but in view of our decision upholding the antenuptial contract we find it unnecessary to pass upon them.

We hold that under the record the decree of the trial court was correct and it is affirmed.—Affirmed.

MILLER, C. J., and OLIVER, BLISS, GARFIELD, WENNERSTRUM, SMITH, and MULRONEY, JJ., concur.

HALE, J., not sitting.