G. H. STORCK, appellee, v. W. N. PASCOE, appellant.

No. 48659.

(Reported in 72 N.W.2d 467)

October 18, 1955.

Uhlenhopp & Cady, of Hampton, and Verne A. Mettler, of Mason City, for appellant.

Leming & Hobson, of Hampton, for appellee.

LARSON, J.—This is an action in equity in two counts brought by the plaintiff, George Storck, against his former partner, W. N. Pascoe, asking confirmation of certain oral contracts and damages for their breach. Count I related to the alleged breach of contract to purchase plaintiff's partnership interest, and Count II related to the alleged breach of contract to lease a building. The Sheffield Auto & Implement Company of Sheffield, Iowa, was owned and operated by the plaintiff with a 60% interest, and the defendant with a 40% interest. The property involved consisted of repair parts, equipment and supplies, housed in a building owned by plaintiff and for which the partnership paid him $100 per month rent. The earnings from the auto sales and repair business were divided 60% to plaintiff and 40% to defendant, as plaintiff had furnished the capital and defendant

provided the management. For some time prior to September 26, 1953, negotiations were carried on between the partners whereby defendant would purchase plaintiff's interest, and an inventory was taken of the parts, equipment and supplies, which showed their reasonable value at $7400. On September 26 plaintiff made an offer to sell and defendant made a counteroffer to buy. Defendant then offered to split the difference; plaintiff accepted and left the premises. Defendant then proceeded at his own expense to remodel, clean up the business office, and make other changes. During the same period of time the parties were negotiating on a building rental agreement. Matters in dispute, relating to the amount of the agreed consideration and whether or not the contract was later abandoned or rescinded, are hereinafter set forth in the opinion.

It was defendant's contention that no oral agreements had been effected, but if such were found to be the case, that these contracts had been repudiated and rescinded by both parties, and since the partnership had been dissolved, the defendant had later disposed of only his 40% interest therein to others. The trial court found for the plaintiff on Count I and rendered judgment thereon in the sum of $3600. In addition, the court found plaintiff had failed to prove the allegations in Count II, but awarded judgment for $40 to plaintiff for the use of the garage building from October 1, 1953, until defendant vacated the premises October 12, 1953. From a total judgment and decree against defendant in the sum of $3640, together with interest and costs, defendant appeals. He relies upon the following propositions for reversal: (1) that the trial court erred in finding from the evidence that the rescission of the contract by the appellant, Pascoe, was ineffective, if an agreement in fact had been reached by the parties; (2) that the trial court erred in finding that a contract of sale had been made between the parties, in view of the record evidence; and (3) that the trial court erred in permitting a recovery on a contract at variance with the contract pleaded by the plaintiff, and the contract which plaintiff's evidence sought to prove.

I. This being an equity case we are required to try it de novo and on its merits as it may appear from the whole record

before us. Economy Hog & Cattle Powder Co. v. Honett, 222 Iowa 894, 270 N.W. 842. The questions presented are purely ones of fact. There is little or no dispute as to the applicable law. It is true, in equity we as an appellate court are not bound by the trial court's findings, but we have said many times we will in a proper case give weight to its findings. This is especially true as to the credibility of the witnesses before it and is most applicable herein. Taggart v. Burgin, 185 Iowa 937, 171 N.W. 113; Worthington v. Worthington, 238 Iowa 1044, 29 N.W.2d 186, and cases cited therein; Murray v. Murray, 244 Iowa 548, 553, 57 N.W.2d 234, 237, and cases cited therein; Wilson v. Wilson, 246 Iowa 792, 68 N.W.2d 904.

II. With this well-established rule in mind, we have carefully examined the disputed record evidence. In support of the trial court's findings on the question of whether or not a contract of sale had been completed, plaintiff points to testimony offered by him as follows:

"We sat down and figured together in the office. My first proposition was to sell my interest for $4400, and he countered with a proposition of $3750 and $150 a month rent. He said he should only pay $3750 as some of the parts were obsolete. I said 'I'll take you up on it.' * * * He said that the $3750 would be paid the first of October. This conversation was on September 25, 1953. Just the two of us were present. Following that conversation I was not back in the business at all. Mr. Pascoe took possession of my interest in the property that day. I have done business in Sheffield since that time and have seen that there were cars going in and out of there. * * * A little later I had a conversation with Mr. Pascoe and he said that he didn't have the money right then but that he would pay me at a little later date. * * * At the time that this $3750 agreement was made, Pascoe said that he would take over the outstanding bills and he was to have the accounts receivable, which amounted to between $800 and $1000. Since that time I have not collected any of those accounts receivable. He has. We had a conversation regarding the automobiles on hand at the time of our agreement of sale. I was to take one used one, and he would take the new ones. (This part of the transaction was carried out.) * * *

After October 1st he employed a mechanic by the name of Mr. Huff. The partnership bank account of less than $50 was transferred to Pascoe. (Pascoe later closed out this account the following December.) * * * Mr. Pascoe had a key to the place and kept it. So far as I know he still has it. * * * Last Saturday night I was in the garage building and examined it to determine what parts and fixtures were left."

Plaintiff also testified he kept a key to the building, not an unusual landlord practice. He further testified that sometime in December, and after Pascoe had told him that he was not going to pay anything, plaintiff did run an ad in the paper to sell his interest in the business, and to sell the garage building. He said: "I had a talk with Mr. Clouse regarding the sale of the garage business. That conversation was by telephone while I was at my home. He said that he had a couple of fellows interested in buying the garage and I told him I couldn't sell because I had already sold to Mr. Pascoe. He said he wanted me to come up to see him so I did. I thought maybe he had a buyer for my other business. I talked to him at his office in Mason City. This was sometime in December. This was after Mr. Pascoe told me that he wasn't going to pay anything. Clouse told me he had two men who were interested in it and he said that if I would buy out Pascoe's share that they would settle. I told him that they should buy from Pascoe because he had bought it from me. I never heard any more from him."

Plaintiff further stated a Mr. Hinch came out to see him and they had a conversation. "He came out one Sunday afternoon— He said he had bought Pascoe's 40% out. I said, 'I don't know what you did, but I know I sold my interest, my 60% interest to Pascoe.' He did not ask me for a key to the building or permission to get into the building. I found out sometime later that he took a load of the stuff from the building, that he had bought some of the stuff from Pascoe. That was the first that I knew about it. During the time that Pascoe and I operated the business as a partnership, neither of us would go out and buy a car independently using our own money. We always bought it through the business. If the business was short of money we put money in. We both put money in. After September 26 I never

asserted any control over this property. Mr. Pascoe was actually in possession of it. The property was delivered to Mr. Pascoe. When the deal was closed it was his to do with as he pleased."

Later plaintiff said he was up to Mr. Hinch's place in Mason City and "saw a lot of the property that originally belonged to the Sheffield Auto & Implement Company. All of the steel bins were there." This item incidentally was a large part of the equipment figure. Plaintiff also stated: "I know of my own knowledge that Mr. Huff went to work at the garage on September 26, 1953. He has told me that he would never work for me."

Defendant on the other hand testified that after some prior negotiations, plaintiff asked $4000 for his 60% share, and that he offered $3200; that on September 26 defendant went in to see plaintiff and said: "I told him I would split with him" and "He said he'd take it." Thereafter plaintiff left the premises and defendant did not see him again during the next two weeks. Defendant then, promptly and without consulting the plaintiff, fired the mechanic, Louis Baker, who had been working for the partnership. Baker, a disinterested witness, said defendant told him "he bought it out and was taking over the shop." On the same day, at defendant's request, Mr. Huff, who had said he would not work for the plaintiff, took over the shop and did repair work using the shop tools, equipment, parts and supplies. Defendant had also suggested that Huff buy the shop equipment, and named him a figure. Huff's testimony disclosed he was a somewhat interested party to these transactions, and we will refer later to his testimony.

The record discloses that a couple of weeks after the September meeting defendant told plaintiff's wife, at the store where she worked, to tell her husband to come down for his money; also that thereafter no accounting, as was usually had each month, was offered or made by defendant to plaintiff for any business transacted or collections made after the September 26th conversation. This evidence was undenied and is quite persuasive, we think, as to the intention of each party to be bound by the agreement resulting from that conversation.

As to subsequent actions the defendant testified: "After

September 26 I continued to run the business as I always had. I was always there. Whatever was sold I sold, the same as I always did." However, when defendant sold two cars after September 26 he had the check made to him personally, explaining it as follows: "I had Mr. Nicholas make out his $110 check to me * * * and I put that check in a Mason City bank, as I had my own money in the cars I sold him. After the 26th of September I sold a car to Mr. Knapp and took two cars in trade. I traded the car that I got from Mr. Knapp for these two cars that I sold Mr. Nicholas. All of this business was transacted right in the garage building and I was running the business. * * * I didn't collect many of our accounts receivable but the money that I did collect I paid bills with. * * * I never thought I took the business over." This statement is not consistent, however, with one made by defendant that he told the Chrysler representative: "I thought I had bought it for $3600." He also said: "After Mr. Huff took over the repair shop he did some repair work. He used some of the parts and equipment and stuff that was in the garage. No one hired Huff, I just told him that if he wanted to work for what he could get he could. Mr. Storck did not have anything to do with the arrangements made with Mr. Huff. I made the arrangements with Huff. If Mr. Huff, in his repair work, needed parts he got them right there. I don't know whether he used any or not. * * * I did not say anything to Storck about firing Baker."

Defendant further testified that on or about October 11 plaintiff, in the presence of three other parties, "came back and asked $3750 and the parts bins" for his share, and on that occasion defendant said he told plaintiff: "* * * I was just all done; I just didn't want it." Thereafter no further conversations took place between them, and the next day defendant closed up the shop and left the premises. Defendant admitted that "during that two weeks (after September 26), I do not recall hearing anything from George Storck." It is true the real-estate broker from Mason City, A. T. Clouse, testified that plaintiff advertised and tried to sell this property as late as November or early December, and that plaintiff told him he should have sold it to his partner back in September when he had the chance.

This however was partially denied and partially explained by plaintiff as previously set out.

Witness Huff said he was present at both conversations and took part in them, stating as to the proposed $150 per month rent: "I told him that we couldn't do that." He also testified he went to work September 26 and "didn't want anything to do with any business that George was mixed up in." He said that "I did use some of the parts and supplies and tools. Whatever the cars needed I took out of stock. During this time Mr. Storck was in and out." This testimony is of course in conflict with all others, that plaintiff was not about the place from September 26 until the day before defendant closed up the business, and the trial court could best determine its value.

█ █ The first question before us is whether or not the evidence discloses any more than an incomplete agreement looking toward the making of a complete contract in the future. The trial court thought it did and we must agree. We said in the Kladivo v. Melberg case, 210 Iowa 306, 313, 227 N.W. 833, 837, often quoted by this court:

, "The existence of a contract, 'meeting of the minds,' intention to assume an obligation, the understanding, are to be determined not alone from words used, but in the situation, acts, and conduct of the parties, and from their situation and the attending circumstances, and by the inferences which mankind would ordinarily and reasonably draw therefrom."

Also see Port Huron Mach. Co. v. Wohlers, 207 Iowa 826, 221 N.W. 843.

As previously pointed out, the rule regarding conflicting evidence is that the weight and credibility of the testimony can best be determined by the trial court. After careful examination of the negotiations and the acts of each before and after September 26, the trial court determined those statements and acts established a sale on September 26.

At the October meeting Mr. Hobson, an attorney, the plaintiff, Mr. Huff, the defendant, and the Chrysler Corporation representative had a conversation. Defendant stated: "The Chrysler man asked if I had gotten things straightened up and I told

him no. I told him before that I thought I had bought it for $3600. * * * The Chrysler man said that he wouldn't do anything about giving us a renewed Chrysler contract until we were all straightened up. * * * That was the time Mr. Storck demanded $3750. * * * At no time did I tell George Storck that I would give him $3750 for his 60% of the tools and equipment. * * * When Mr. Hobson and Mr. Storck talked to the Chrysler man and me they wanted me to pay the $3750. I said no, that I had never agreed to pay $3750."

The preponderance of the credible evidence, we feel, sustains the trial court's finding that a contract had been entered between the parties, and, while the evidence is in direct dispute as to the agreed price, the court adopted the amount claimed by defendant in the sum of $3600, of which he cannot complain, and we are satisfied with that determination.

III. Defendant urges that even though it is found both parties considered the agreement made September 26 a valid and binding sale, plaintiff's act, in coming to the garage some two weeks later demanding more than the sum agreed upon, or $3750 plus the parts bins as the agreed compensation, amounted to an abandonment of the original agreement and resulted in defendant's justifiable rescission of the contract. Considering for the moment that an oral contract had been effected, it now becomes defendant's burden to prove the abandonment or rescission he alleged. Here again we must agree with the trial court's construction of this transaction and conclude from succeeding acts of the parties that there was no abandonment or rescission of the original agreement. The court found that while plaintiff's October demands would have justified a rescission of the contract, the subsequent acts and circumstances disclosed that neither party considered the sales agreement repudiated. This was indeed a close question and is the real crux of the case. Defendant contended plaintiff's claim that the agreement provided he should have $3750 and keep the parts bins amounted to a refusal to settle upon the terms of the September 26th agreement. It is of interest that no claim is made that defendant tendered payment under the agreement understood by him at that time. None was refused, and while there is some merit to defendant's position, subsequent events we think were correctly

held to disclose no abandonment or rescission was intended or understood by either party.

Abandonment is the relinquishment, renunciation or surrender of a right. Its existence depends upon intention and acts evidencing intention to abandon. As hereinbefore pointed out, plaintiff continued to exercise no control over the business or the equipment after September 26, and several times thereafter advised others of the sale. If believed, the testimony of defendant's witness Clouse would suggest plaintiff had abandoned the sale. The trial court was in the best position to determine the weight and credit to be given this conflicting testimony. The law is clear that the act of relinquishment must be unequivocal and decisive. Kladivo v. Melberg, supra. Such does not appear in the case before us. Also see 12 Am. Jur., Contracts, section 442, page 1024.

On the other hand we find no evidence or testimony relating to restoration or an accounting for past collections and receipts, nor any offer or attempt by defendant toward restoration. We announced the applicable rule in Butler Mfg. Co. v. Elliott & Cox, 211 Iowa 1068, 1072, 233 N.W. 669, 670, where we said:

"Until restoration or offer to make restoration is made, there is ordinarily, at law, no rescission [citing cases]. When the buyer rescinds, he renounces the contract and his ownership of the property obtained thereunder, and invests the seller with the ownership as if the contract had not been made. Continued exercise by the buyer of ownership or dominion of the property after notice of rescission and offer to return necessarily asserts ownership in the buyer, denies the ownership of the seller, and waives or withdraws the notice."

Also see Advance-Rumely Thresher Co. v. Wharton, 211 Iowa 264, 233 N.W. 673, 77 A. L. R. 1153, and many other cases cited therein.

In 12 Am. Jur., Contracts, section 451, page 1031, we also find: "The very idea of rescinding a contract implies that what has been parted with shall be restored on both sides."

In Kilpatrick v. Smith, 236 Iowa 584, 596, 19 N.W.2d 699, 705, we said: "It is a well-recognized rule that one who rescinds

a contract must restore or offer to restore the status quo of the other party. He must return or offer to return what he has received. And if there is a mutual rescission each party is entitled to be put in statu quo so far as possible. Each is to be restored to his former rights, and placed in the situation each occupied before the contract was entered into so far as it is equitably and reasonably possible. This court has so held many times." (Citing many cases.)

Once the contract to sell was established, the defendant had the burden of proving a valid and effective abandonment or rescission. See Staly v. McNerney, 233 Iowa 1065, 1074, 10 N.W. 2d 584, 589. However, defendant kept all the benefits, disclaimed interest in the fair and just distribution of partnership assets, and even if we should find he had given notice of rescission, his succeeding acts must be held to have constituted a denial of the ownership of the plaintiff-seller and a withdrawal of the alleged notice of rescission. Advance-Rumely Thresher Co. v. Wharton, supra.

No claim is made here that defendant returned or offered to return to plaintiff his share in the bank account or accounts receivable previously transferred to him. Nor was any accounting offered as to the transactions during the period from September 26 until the doors were locked. In all fairness, plaintiff was entitled to one or the other. The trial court carefully examined defendant as to his continued exercise of ownership over the parts and equipment after the business was closed up October 12, and was convinced defendant's act in selling the parts, equipment and supplies to Mr. Hinch amounted to an exercise of dominion and ownership over the whole rather than the disposition of an undivided 40% interest therein. From the testimony offered by defendant as to his exercise of dominion over the whole property, the trial court was satisfied he did not sell his 40% interest in the business, but any and all of the property Mr. Hinch wanted in that garage. Defendant testified:

"I don't know what Hinch took from the garage. I haven't been there for two or three months. * * * I gave the key to Verne (his lawyer), and he said he was going to talk to George (the plaintiff) about it and then see what he could do.

"Q. Now, do you claim at the time you made the sale to Mr. Hinch you only owned forty per cent of this stuff? A. Forty per cent is all I owned; yes.

"Q. And that is all you owned? A. That was my share; forty per cent. * * *

"The Court: You mean the forty per cent he got was stuff that he would go in and pick out and say: Now, that equals forty per cent of the whole. Witness: Yes, he was supposed to go in and they were supposed to ——

"The Court: In other words he was getting full interest in whatever he got. It wasn't an undivided interest. Witness: Well, he told me he was going out to see Storck and talk to him about it.

"The Court: I didn't ask you that. I asked you what you were selling him. Witness: Well, I was selling my forty per cent.

"The Court: Well, did that include all of some particular items, and then you added the total of these particular items and that made your forty per cent? You were getting out your money? Witness: No, he was to divide it up so it was to be about equal.

"The Court: It was to be divided by him then. Witness: Yes.

"The Court: So whatever he got belonged to him and whatever he took was your share? Witness: That is what it was supposed to be. * * *

"Q. Then you didn't sell your forty per cent undivided in the Storck fixtures and equipment and what not? That is, your undivided forty per cent interest? A. Well, I sold forty per cent. I don't know——"

Defendant also testified: "The last time I was there the desk wasn't there. I don't know who got it. * * * I did not look in the parts room at all to see what parts were there and what were not. I don't have any idea what was there. Some of the parts bins were there and some were gone. 1 don't know what Mr. Hinch got and I don't know what is in the garage building now."

He also testified: "I left my interest in the partnership pile

up until we had paid for everything, although it was originally Storck's money that was in the business and I had nothing in it at first. * * * He (Hinch) was not supposed to get Storck's property and I don't know whether he did or not.

"The Court: Do you mean to say that the stuff was divided: part of it was Storck's and part of it was yours? Witness: Forty per cent of it was mine and sixty per cent of it was his.

"The Court: So what you did was tell Hinch to go in and take your forty per cent and that was yours, and that what was left was Storck's. Is that it? Witness: I told him to go out and talk to Storck * * *.

"The Court: So you actually don't know what he took and you don't know what you got for it? Witness: Well, I can tell you just about what I got for it."

We think this testimony, as well as defendant's attitude, greatly influenced the trial court in finding that this sale to Hinch was an exercise of individual ownership of all the property, for clearly defendant did not intend to sell his undivided interest in all of the parts and equipment, but did sell *all of some of them*. This was virtually his admission when asked: "Did you sell him a forty per cent interest in the hoist?" and he said: "No. The hoist in the floor didn't go with it." While there was no evidence anyone else removed any goods or equipment from the garage, nevertheless it was undisputed that only $450 worth remained, and there is a strong inference that Hinch, acting under defendant's authorization, removed all that was taken from the garage. We are satisfied defendant's liberty with all the partnership assets justified the trial court in finding such dominion exceeded defendant's former undivided interest therein. No partnership dissolution agreement was ever claimed to justify such a sale by defendant.

The legal effect of acts asserting and continuing ownership and dominion of the goods and consequent affirmation of the contract may not be overcome merely by testimony to a contrary intention. Thus defendant's statement that he sold Hinch only his forty per cent will not overcome the legal effect of permitting him to take his choice of all the parts and equipment, thereby exercising a dominion over the property which far exceeded

that of a manager-partner. This control and dominion was more nearly that which we would expect of a sole owner of the property.

We conclude therefore that the trial court was not in error in its determination that the contract of sale was not abandoned or rescinded. We are mindful that there was some evidence plaintiff tried to sell his interest therein in November or December following the agreement, but that action was explained as coming after defendant advised plaintiff he would pay nothing on the contract of sale. Certainly a breach of the contract by one party would justify the other in so mitigating his damage.

IV. The defendant further contends plaintiff cannot recover on a contract different from that pleaded and cites several cases to sustain this rule. They are not in point. This is not such a variance as to fall under the rule that a contract relied upon must be established as pleaded. It is not the fatal variance found in cases where an oral contract is alleged and a written one established, or where one seeks recovery on quantum meruit and establishes a contract. Such are the situations where the well-established rule is applicable. It has no application here, for the recovery granted, though in a different amount from that stated in the pleading, was under the terms of the alleged oral contract and not by some other theory of liability.

V. While the trial court found plaintiff had failed to prove a new lease or agreement by a preponderance of the evidence, it found defendant assumed the partnership rental agreement and prorated that rent for the period defendant used the premises. We are inclined to agree that such finding and determination was just and equitable under the circumstances disclosed. Although the facts do not prove a new agreement, they clearly indicate a mutual understanding of the applicability of the present occupancy rental until changed by a contemplated subsequent new agreement.

VI. We believe the contract of sale and the lease agreement were separate transactions. It was not shown, we think, that the one was dependent upon the other. The prompt exercise of complete ownership indicated by defendant's re-

modeling, replacing personnel, and making other changes, with or without plaintiff's knowledge or approval, indicates no intention to delay the sales contract until a final agreement was reached as to the terms of the lease. The partnership operated under an oral lease and could continue to do so until those arrangements were terminated. No such threatened action made this sales contract dependent upon the new lease agreement.

It follows from what we have said that we believe the trial court was right in its determination and judgment, and it is therefore affirmed.—Affirmed.

BLISS, GARFIELD, WENNERSTRUM, and THOMPSON, JJ., concur.

OLIVER, C. J., and SMITH and HAYS, JJ., take no part.