**In re the MARRIAGE OF Mary Louise PILLARD and Paul Pillard.**

**Upon the Petition of Mary Louise Pillard, Petitioner–Appellee,**

**And Concerning Paul Pillard, Respondent–Appellant.**

**No. 88–696.**

Court of Appeals of Iowa.

Nov. 3, 1989.

Murray W. Bell of Walter Newport & Associates, Davenport, for respondent-appellant.

Michael Kane, Maquoketa, for petitioner-appellee.

Considered by DONIELSON, P.J., and SACKETT and HABHAB, JJ.

HABHAB, Judge.

Paul Pillard appeals the property division awarded by the district court in the parties' dissolution. The sole issue presented in this appeal is whether the district court erred in finding that the parties had abandoned their antenuptial agreement. We affirm as modified.

Paul and Mary were married on December 23, 1977. Each has been married previously, and each has adult children from a prior marriage. No children were born of this marriage. Prior to their marriage, the parties cohabited for approximately one year. In March of 1976, Paul agreed to purchase a 376–acre farm (the farm) on contract for deed. At that time he was living on a forty-acre tract of land which he owned. After moving in with Mary in December of 1976, Paul sold the forty-acre tract in order to raise funds for the down payment on the farm. He also borrowed $6,000 from a Mr. Steinhagen, $15,000 from a Mr. Ehlinger, and $3,000 from Mary. All of these monies were applied to the down payment on the farm.

In March of 1977, when the sale of the farm to Paul was finalized, Paul and Mary moved to the farm. In the months predating the parties' marriage, Paul borrowed an additional $4,650 from Mary. Then, shortly after the marriage, he received an additional $500 from her. The funds Paul received from Mary were considered by the parties, at least originally, to be in the nature of loans. None of the funds borrowed from Mary were repaid, nor were those borrowed from Steinhagen.

On December 22, 1977, the day before the parties' wedding, Paul took Mary to his attorney's office to sign an antenuptial agreement drafted by Paul's attorney, Larry Jungman. The gist of this agreement was that the parties' separate properties were theirs to do with as they wished and were free from all claims by the other party. The agreement also contained a clause which freely permitted transfers of property between the parties.

Paul farmed during 1977, 1978, and 1979 without much success. In order to devote his full attentions to farming, Paul discontinued his employment at Caterpillar. Mary and Paul accumulated joint debts concerning the farming operation during this time period. Mary also contributed her income and services to the farming operation. In 1979, Mary returned to work with her present employer. In 1980, the farm was sold on contract to Dr. Schuller for a considerable profit. The equity in this contract is currently $211,832.

Following the sale of the farm, the parties used the $100,000 down payment to retire jointly-held debts and as a down payment on a home in town. Mary and Paul commingled their funds throughout the marriage. In November of 1987, the parties had debt at the Hawkeye Bank amounting to $110,806 secured by two notes. One note is for $87,806 and the other is for $23,000.

The district court found the parties' assets, not including the farm contract, to be worth approximately $120,000, while their debts totaled $130,000. In dividing the parties' property, the district court concluded that it would be inequitable to give much, if any, weight to the antenuptial agreement because the agreement had been abandoned by the parties. The district court went on to award each party a one-half interest in the equitable title to the 376–acre farm and in the contractual rights resulting from the sale of the farm. The district court, however, in its decree failed to apportion the debt of the Steinhagen note and the Hawkeye Bank note.

Our review here is de novo. Iowa R.App.P. 4. We give weight to the district court's findings of fact, but are not bound by them. Iowa R.App.P. 14(f)(7).

■ Antenuptial contracts are looked upon with favor by the law and are to be liberally construed to carry out the intentions of the parties. *In re Parish's Estate,* 236 Iowa 822, 20 N.W.2d 32, 36 (1945). The purpose of such contracts is to fix the interests of the respective parties in the property of the other. *Id.,* 20 N.W.2d at 36. However, antenuptial agreements differ in no way from other normal contracts. We construe, consider, and treat them the same as we do ordinary contracts. *O'Dell v. O'Dell,* 238 Iowa 434, 435, 26 N.W.2d 401, 412 (1947). As with any contract, a party to an antenuptial agreement may abandon such an agreement. *See id.* at 456, 26 N.W.2d at 412; *see also In re Marriage of Zimmerman,* 714 P.2d 927, 929 (Colo.App.1986); *In re Marriage of Burgess,* 123 Ill.App.3d 487, 78 Ill.Dec. 345, 462 N.E.2d 203, 204 (1984). As the Iowa Supreme Court has noted:

> Abandonment of a contract is "the relinquishment, renunciation or surrender of a right. Its existence depends upon intention and acts evidencing intention to abandon"....

> Abandonment of a valid contract may be accomplished by express agreement, or the parties, by conduct consistent with the continued existence of the original contract, may estop themselves from asserting any right thereunder.

*Iowa Glass Depot, Inc. v. Jindrich,* 338 N.W.2d 376, 380 (Iowa 1983) (quoting *Storck v. Pascoe,* 247 Iowa 54, 64, 72 N.W.2d 467, 472–73 (1955)).

■ As there is no express agreement between the parties to abandon the antenuptial agreement, we must look to see if the parties engaged in a course of conduct which evidences their desire to unequivocally and decisively abandon the terms of the agreement. *See id.* We believe such actions are of record in this case. The parties commingling of their respective properties coupled with the fact that the farm contract was paid from commingled funds along with the fact that Mary contributed her earnings to the farm operation

and its debt demonstrates an intent on their part to ignore and abandon their agreement. Specifically, Mary's $3,000 contribution to the down payment on the farm, as well as the additional $4,650 she gave Paul prior to the marriage, were never repaid by Paul. This course of conduct attests to the parties' abandonment of their antenuptial agreement, for by such conduct the parties implicitly chose to ignore their agreement and treat their separate properties as marital property. *See Zimmerman,* 714 P.2d at 929. Therefore, we affirm the trial court's finding as to the abandonment of the antenuptial agreement.[1] We would, however, modify the judgment in one minor respect. The district court in its decree failed to apportion the Steinhagen and Hawkeye Bank debt on the $87,806 note between the parties. We believe Mary should assume one-half of the Steinhagen debt. We further order that after the proceeds of the sale of the Dagitz property are applied against the $87,000 Hawkeye Bank note, Mary shall be responsible for one-half of the remaining debt. In all other respects, the judgment of the district court is affirmed. Costs shall be assessed to the appellant. Costs are assessed to the appellant.

AFFIRMED AS MODIFIED.

DONIELSON, P.J., concurs.

SACKETT, J., specially concurs.

SACKETT, Judge (specially concurring).

I concur with the decision reached by the majority because I consider it, as they do, an equitable resolution of the economic issues in this dissolution.

However, unlike the majority, I do not find the issue of whether the premarital agreement was abandoned to be the area of focus in this dissolution or to be controlling on the issue of an equitable resolution. Premarital agreements in this state are recognized and enforced. Provisions of antenuptial agreements which allow parties

to relieve themselves of obligations which attach to a marriage contract are generally void as against public policy. *See Norris v. Norris,* 174 N.W.2d 368, 369–71 (Iowa 1970). In *Norris,* the court held void as against public policy the following provision in a marriage contract:

> This contract is made on the assumption, on the part of both parties, that their life together, after marriage will be happy and congenial and free from any domestic discord, but should any discord arise involving court proceedings, neither party shall have the right to claim anything of the other's property under this contract, but the property rights of the parties shall stand just as they were before the marriage occurred.

174 N.W.2d at 369; *see also York v. Ferner,* 59 Iowa 487, 491, 13 N.W. 630, 632 (1882) (consideration for an antenuptial contract is the marriage contract; if the marriage contract is broken and violated, the marriage contract cannot be enforced); *Veeder v. Veeder,* 195 Iowa 587, 597, 192 N.W. 409, 413 (1923).

The Iowa court has clearly said provisions limiting alimony in a prenuptial agreement are void as against public policy, *In re Marriage of Winegard,* 278 N.W.2d 505, 512 (Iowa 1979); *In re Marriage of Gudenkauf,* 204 N.W.2d 586, 587–88 (Iowa 1973); *Norris,* 174 N.W.2d at 369–70, and has, in spite of a prenuptial agreement to the contrary, awarded to a spouse a substantial lump sum, an award they determined to be in lieu of alimony. *Winegard,* 278 N.W.2d at 512; *Gudenkauf,* 204 N.W.2d at 588.

I agree with the majority that the agreement can be considered under the dictates of chapter 598. *See Britven v. Britven,* 259 Iowa 650, 656, 145 N.W.2d 450, 454

---

**1.** We note under section 598.21(1)(*l*) that the provisions of a valid antenuptial agreement is a factor to be taken into consideration by the court in dividing property; we also note that under section 598.21(3)(i) it is also a factor to be considered when determining whether the court is to enter an order requiring support to either party.

(1966). The end result in any dissolution action is not an interpretation of a prenuptial agreement but an assessment of all factors, including the agreement, to see if there is in fact an equitable result. An equitable result was reached here. I would affirm.