In re the **MARRIAGE OF Marion D. VAN BROCKLIN and Donald J. Van Brocklin,**

**Upon the Petition of Marion D. Van Brocklin, Appellee,**

**And Concerning Donald J. Van Brocklin, Appellant.**

No. 89–1384.

Court of Appeals of Iowa.

Jan. 29, 1991.

John R. Walker, Jr., of Beecher, Rathert, Field, Fister, Walker & Morris, Waterloo, for appellant.

Christopher F. O'Donohoe of O'Donohoe, O'Connor & O'Donohoe, New Hampton, for appellee.

Considered by HAYDEN, P.J., and SACKETT and HABHAB, JJ.

HABHAB, Judge.

Don and Marion Van Brocklin were married on October 21, 1972. It was the second marriage for both, and each have children from a previous marriage. Marion is now sixty-six years of age, and Don is sixty-one.

Prior to their marriage, Don and Marion executed an antenuptial agreement limiting each other's right to share in the other spouse's estate. The agreement provided that each would be receiving inheritances and that Marion had brought into the marriage substantial assets that she did not desire to share.

At the time of the execution of the agreement, Marion had approximately $22,000 in cash and a house in Fredericksburg, Iowa, valued at $10,000. Ten years earlier, Marion had received $50,000 from a divorce settlement and had used part of that to supplement her income and support her children in college. Marion continued to work as a bookkeeper, reaching a salary of $8.50 per hour, or $260 per week.

In 1974, Don started an excavating business using Marion's credit. Over a period of several years Marion advanced approximately $10,000 towards the business. In August 1974, Don's mother died. Judd, Don's father, survived. From that time until Judd's death in December 1985, Don and Marion performed numerous services for him. Don took over most of the farm operations, and Marion did the bookkeeping. Don was paid $1,600 annually for his work relating to the farm property, and Marion received $500 for her services. Marion also performed housekeeping services for Judd, until Judd moved to a nursing home in 1978.

In July of 1979, Judd began making annual tax-free gifts to Don in the amount of $2,000. In 1982, Judd started making gifts to Marion as well, and, at the time of

Judd's death in 1985, he had given Don $36,500 and Marion $32,250 in tax-free gifts.

In 1981, Don inherited forty acres of land from his great aunt. He worked extensively on the land, clearing rock and removing trees. Marion testified at trial that Don put in 107 hours of labor worth $4,547.50. Don sold the cut timber for $5,500. This money was placed in the joint checking account. The parties invested approximately $24,828 of their marital funds to make the farmland tillable.

By 1979, Marion transferred her home to both her and Don's name. She had by that time also closed her remaining accounts and had transferred such funds to joint accounts. An additional $10,000 worth of repairs and additions had been done on the marital home, including a machine shed Don used for his business. The two had also executed new wills leaving all of their property to the survivor.

Don's father died on December 26, 1985. Don received the bulk of his father's estate, which included 330 acres of farmland and $158,000 in cash. Marion was not named in the will. All but $16,000 of the cash was put in Don's personal accounts, and was not commingled with joint assets. The $16,000 was placed in a joint account because of FDIC insurance limits.

Marion filed the present action on October 17, 1988, and trial was held on May 25, 1989. At trial, Marion's counsel argued that the terms of the antenuptial agreement had been abandoned by the conduct of the parties over the years in commingling funds and executing joint wills.

Marion testified that Don would not have been successful in his business had she not worked as bookkeeper and managed their finances. She argued she should receive a portion of Don's inheritance from Judd for she had cared for him for a number of years and had developed a close relationship with Judd, closer than his own daughters. Marion also argued that she should receive a percentage of the inheritance received by Don from his great aunt, since joint funds were used to develop the property. Don argued that Marion had no right to such portion of his inheritance since the antenuptial agreements were executed at the insistence of Marion and were still in force and effect, for both parties had contemplated future inheritances.

The trial court entered its decree on August 9, 1989. It is necessary for us to determine the distribution and value of the assets made by the trial court. In this respect, we note that the positions taken by the appellant and appellee are substantially consistent. There are differences, however, that demand our attention, and we will address those in subsequent paragraphs.

The appellant, in his accounting to us, claims that Marion was awarded a total of $141,594.49 of joint assets while he was awarded only $53,378.03. Appellant further claims Marion was awarded $106,688.68 of the cash he inherited from his father, while he only received $58,431.02 of the cash from his dad. Appellant concludes by arguing that Marion also received the real estate which she brought into the marriage, along with the $5,349 she inherited from her father's estate. He acknowledges receiving the real estate he inherited from his father, along with that from his great aunt's estate.

The appellee agrees in part with several of the claims made by the appellant in the preceding paragraph and disagrees as to others. To strengthen her position, the appellee sets forth for our benefit a separate accounting schedule. We have compared the appellant's and appellee's positions with the trial court's decree and are compelled to make certain adjustments which we set forth below:

1. The appellee claims the trial court awarded the Templeton World Fund to Marion. The record reveals this item valued at $5,252 was awarded to Don. We note this entry does not affect the appellee's total and conclude it is merely inserted in the wrong column.

2. The appellee valued the State Bank of Lawler (JUB) account to Donald at $22,585. The trial court placed a value of this award at $12,087. We accept the trial court's valuation.

3. The appellant valued the Nexus Resource Corp. stock at $2,480 and the Everest stock at $200. The trial court, however, fixed those valuations at $4,400 and $500, respectively, which is consistent with the accounting statements of appellant's expert witness.

4. The appellant claims that Marion received the National Bond Fund and included this in his statement as an award to her. We assume this is the same entry as that of the trial court when it listed this item as "National Securities Bond in the approximate amount of $14,726." The trial court awarded this item to Don.

5. The appellant places a value of $16,703.56 on the First Investors Tax Exempt Fund. The trial court gave it a value of $16,337, and this is consistent with the appellant's exhibit prepared by his accountant.

With these adjustments in mind and without including here the items listed in appellee's statement under "Real Estate" and the items accounted for as Don's inherited property, but including the value of the miscellaneous personal property listed in appellee's statement, we find that Don received total marital assets having a value of $94,143. With those adjustments, this figure is consistent with the amount set forth in appellant's and appellee's briefs.

Likewise, when we make the necessary adjustments as to the award made to Marion with the same inclusions and exclusions, we find she received total marital assets of $134,474. We believe this figure is also consistent with those of the appellant and appellee.

For reasons not entirely clear from the record, three shares of Battle Island Park valued at $4,500 are listed in appellee's statement of account. It was awarded to Don by the trial court, and in appellee's statement it is accounted for under Real Estate, but is not mentioned in appellant's statement. Since the award is to Don, we increase his marital property award from $94,143 by that amount, thus bringing his total to $98,643.

The value of the vehicles, farm machinery, equipment, and tools are not included in the above. The value of these assets, based on the Humpal appraisal (reduced by the value of property allocated in the accounting above) to which the parties made reference from time to time equals $38,685. When this property is sold, each will receive an equal share of the net proceeds of some $19,342, reduced of course by any sales costs.

Thus, the breakdown from the computations above is as follows:

| Don | | Marion | |
|---|---|---|---|
| Marital Assets | 94,643 | Marital Assets | 134,474 |
| Approx. | 19,342 | Approx. | 19,342 |
| | 113,985 | | 153,816 |

We turn now to the value of the assets, excluding the real estate inherited by Don from his father. When Don inherited that property, it had a value of $158,255. The trial court distributed those inherited assets (the value had increased by trial time) in such manner that Don received $69,968 [1] (this amount includes the $8,300 fixed as

1. The appellant alleges the amount of the inherited property awarded Don by the trial court equals $80,466. However, the trial court fixed the value of the State Bank of Lawler account at $12,087. When the $22,585 figure claimed by appellant is reduced to $12,087, the inherited distribution to Don equals $69,968. Don claims he only received $58,430 of inherited funds from the trial court. However, in his statement, he did not include the value of the 1985 Chevy of $8,300 or the $555 value of the Noel Brockway contract and he claims the Lawler account to be but $9,405 when the court fixed it at $12,087. When those adjustments are made, the total equals $69,967.

the value of the 1985 Chevy that was purchased with inherited money) and Marion received $106,619.[2]

We turn next to the distribution of the inherited real estate along with the property brought into the marriage. The trial court awarded Don the 40–acre farm he inherited from his great aunt valued at $36,500, the 330 acres he inherited from his father valued at $193,560, and the trailer home in Arizona purchased with inherited funds valued at $23,000. Marion was awarded the home she brought into the marriage valued at $25,000 along with the $5,349 she received from her father's estate.

Don argues that Marion has no legal or statutory right to share in the inheritance received from Judd. He contends Marion should receive no more than a $12,411.90 interest in the property Don inherited from his great aunt. Don further maintains that the trial court lumped Don's two separate inheritances together, which should not have occurred. Don argues that the cash from Judd's estate was placed into his own separate bank account and that Marion never managed these accounts. Don further maintains that while Marion was very caring and generous towards Judd, any services performed stopped after 1978, seven years before Judd's death. Don also contends that Marion was compensated for her services during Judd's lifetime.

Don additionally argues that had Judd actually had such a close relationship with Marion, he would have named her as a beneficiary in the will. Don also contends that joint funds were used in upgrading Marion's home and that if Marion can obtain a share of Don's inheritance, he should receive equity in Marion's home.

■ *Scope of Review.* In this equity action, our review is de novo. Iowa R.App.P. 4. We have a duty to examine the entire record and adjudicate anew rights on the issues properly presented. *In re Marriage of Steenhoek,* 305 N.W.2d 448, 452 (Iowa 1981). We give weight to the

fact findings of the trial court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R.App.P. 14(f)(7).

■ *Inherited Property.* The focal dispute with regard to the economic provisions involves the inheritance Don received from his father during the course of his marriage to Marion. Don contends Marion should not be awarded any of the inheritance based upon the statutory guidance provided by Iowa Code § 598.21(2) which provides:

> property inherited by either party or gifts received by either party prior to or during the course of the marriage is the property of that party and is not subject to a property division under this section except upon a finding that refusal to divide the property is inequitable to the other party or to the children of the marriage.

Section 598.21(2) is substantially a codification of principles established by previous case law. *In re Marriage of Thomas,* 319 N.W.2d 209 (Iowa 1982). Those cases and the statute start with the premise that the property is not subject to division; but the premise yields where its application would be unjust. *Id.* at 210. Our supreme court in *Thomas* had this to say:

> As noted, the requirement to set aside to a party the property which has thus been inherited or received as a gift is not absolute. Division may nevertheless occur to avoid injustice. A number of factors might bear on a claim that property should be divided under this exception. These include:
>
> (1) contributions of the parties toward the property, its care, preservation, or improvement;
>
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
>
> (3) separate contributions by the parties to their economic welfare to whatever

---

**2.** This figure coincides with appellee's but differs from appellant's. Appellant listed the Dean Witter account at $11,194.16. His accountant gave it a value of $11,124. Thus, the discrepancy in appellant's statement.

extent those contributions preserve the property for either of them;

(4) any special needs of either party;

(5) any other matter which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee. Other matters, such as the length of the marriage or the length of time the property was held after it was devised or given, though not independent factors, may indirectly bear on the question for their affect on the listed factors. Still other matters might tend to negative or mitigate against the appropriateness of dividing the property under a claim that it falls within the exception.

The appellee has argued with some degree of persuasion that the inherited property of Don should be divided. She argues there was an independent, close relationship between Don's father and her. But to offset this assertion, it cannot go unnoticed that she received substantial gifts in the form of cash from Don's father and took compensation from him for a number of the services she performed.

■ The appellee also argues that marital property was used to enhance the value of the property that Don inherited from his great aunt. We believe there is merit in this contention and it is a factor that should be considered in the overall distribution schedule.

However, there are a number of factors which mitigate against dividing the inherited property in the manner urged by the appellee. First, there was not a great deal of time that elapsed from the date Don inherited the property and the appellee commenced her suit to dissolve this marriage. Second, it is clear that none of the marital assets were diverted to enhance the value of the farm that Don inherited from his father. Third, the inherited assets are easily identified and were not commingled with the marital assets.

According to our computations, Marion received $134,474 of the marital assets as compared to Don's $94,643. In addition, she will receive approximately $19,342 as her share from the sale of the farm ma-chinery. She also will receive her home, which has an enhanced value of $25,000, and the $5,349 from her father's estate. Under the circumstances of this case, we are unable to hold the premise as enunciated in the *Thomas* case (i.e., inherited property is not subject to division) must yield to the exception that its application would be unjust. We think the contrary is true.

■ *Antenuptial Agreement.* The trial judge found the parties' actions after the marriage rendered the antenuptial agreement ineffective. He based this decision on the grounds that Marion and Don held substantial property jointly, including property which Marion brought into the marriage, and that both Marion and Don had written wills leaving their estates to each other. Based upon these actions the trial court found that the agreement was no longer in effect.

■ As a general rule, antenuptial contracts are favored in the law and should be construed liberally to carry out the intention of the parties. Courts will uphold them if they are fair between the parties and fairly, freely and understandingly entered into. *Norris v. Norris,* 174 N.W.2d 368, 369 (Iowa 1970). There is no claim here that appellee did not understand wholly the terms of the antenuptial agreement. Actually, it appears that she was the moving party in insisting that such agreement be prepared and signed. At the time of the marriage, her net worth exceeded that of the appellant.

■ The purpose of antenuptial agreements is to fix the interests of the respective parties in the property of the other. *In re Parish's Estate,* 236 Iowa 822, 20 N.W.2d 32, 36 (1945). However, antenuptial agreements differ in no other way from other normal contracts. We construe, consider and treat them the same as we do ordinary contracts. *O'Dell v. O'Dell,* 238 Iowa 434, 435, 26 N.W.2d 401, 412 (1947).

Appellee claims the antenuptial agreements were abandoned. We held in *In re Marriage of Pillard,* 448 N.W.2d 714, 715 (Iowa App.1989), that antenuptial agree-

ments, as with any contract, may be abandoned by the parties. *See O'Dell,* 238 Iowa at 456, 26 N.W.2d at 412; *see also In re Marriage of Zimmerman,* 714 P.2d 927, 929 (Colo.App.1986). As the Iowa Supreme Court has noted:

> Abandonment of a contract is "the relinquishment, renunciation or surrender of a right. Existence depends upon the intention and acts evidencing intention to abandon." *Storck v. Pascoe,* 247 Iowa 54, 64, 72 N.W.2d 467, 472–73 (1955). The act of relinquishment must be unequivocal and decisive. *Id.* 247 Iowa at 64, 72 N.W.2d at 473.
>
> Abandonment of a valid contract may be expressed by express agreement of the parties, or the parties, by conduct inconsistent [3] with the continued existence of the original contract, may estop themselves from asserting any right thereunder.

*Iowa Glass Depot, Inc. v. Jindrich,* 338 N.W.2d 376, 380 (Iowa 1983) (quoting *Severson v. Elberon Elevator,* 250 N.W.2d 417, 421 (Iowa 1977)).

In holding in *Pillard* that there had been an abandonment, we determined from the record that the parties engaged in a course of conduct which evidenced their desire to unequivocally and decisively abandon the terms of the agreement. The parties there to a significant degree acted in a manner inconsistent with their antenuptial agreement.

However, here, from our de novo review of the record, we are unable to find that the parties' actions were so unequivocal and decisive as to rise to the level of relinquishment or abandonment. Nor are we able to find that the parties acted in a manner inconsistent with their antenuptial agreements.

Under the provisions of the antenuptial agreement the parties acknowledge their potential for inheritance, and each agreed "that it is their intent that anything they inherit from this point forward shall likewise be free of any claim in the other spouse arising out of the existence of the marital relationship between them and shall be preserved, separate and entire as the property of the spouse who inherits. The parties also agreed that if they desired "and without violating the terms of this instrument" they could place property acquired after marriage in joint tenancy, and they further agreed that they could provide for the disposition of their property by will, and that if they did dispose of property by will, they agreed "that any such will shall in no way affect the disposition of properties outlined by this agreement." Finally, the parties agreed:

> 7. It is further understood and agreed that no claim by virtue of the marital status shall attach to any property of the parties whether acquired during the marriage or as a result of their common effort or in any other fashion except to the extent that the parties elect to use their right to so decide by will or by taking title in both their names.

■ Under the facts and circumstances of this case, we are unable to find that the antenuptial agreement has been abandoned. We do hold, however, that any provision in the antenuptial agreement which may be interpreted as prohibiting alimony is contrary to public policy and thus void. *In re Marriage of Gudenkauf,* 204 N.W.2d 586, 587 (Iowa 1973).

■ *Disposition.* We note under Iowa Code section 598.21(1)(*l*) that the provisions of a antenuptial agreement are to be taken into consideration by the court in dividing property. In this case the trial court, confronted with a variety of problems and a number of marital and inherited assets, painstakingly made a distribution thereof. In view of our findings above, we modify the trial court's decree in the following respects: We direct that the inherited property of Don from his father should be transferred back to him, i.e., the State Bank of Lawler CD 18626, of $16,265.54 and the State Bank of Lawler CD 17230 of $64,228.98. Don agreed that Marion was to receive $12,411.90 as one-half of the

---

**3.** Although we set forth this quoted provision in our case of *In re Marriage of Pillard,* we do so again to correct certain omissions that occurred in the *Pillard* case.

amount of marital assets that was invested to improve the farm that Don inherited from his great aunt. We confirm this amount and provide that the Dean Witter tax-exempt inheritance that Don received from his father shall go to Marion and that Don shall pay her in cash the difference between the $12,411.90 and the Dean Witter tax-exempt amount of $11,194.16.

We recognize that we have reimbursed Marion for her share of the marital assets that were used to improve the farm that Don inherited from his aunt without giving the same consideration to Don for the marital funds that were spent to improve the home that Marion brought into the marriage and which was awarded to her as her separate property. However, under the circumstances here, we believe this result is equitable.

 Marion also claims that she is entitled to $100 per month alimony because she quit her job early at Don's request and is therefore receiving less in her social security check. Alimony is not an absolute right; an award depends upon the circumstances of each particular case. *In re Marriage of Fleener*, 247 N.W.2d 219, 220 (Iowa 1976). The discretionary award of alimony is made after considering those factors listed in Iowa Code section 598.-21(3). *See In re Marriage of Hayne*, 334

N.W.2d 347 (Iowa App.1983). We affirm the trial court in its denial of alimony.

In conclusion, we affirm the trial court in all respects except for the two items of inherited property and the method of disposition of the third which we modified earlier in this opinion.

After reviewing the parties' financial position, we find each should be responsible for his or her own attorney fees, and the costs of this appeal shall be assessed one-half to each party.

AFFIRMED AS MODIFIED.

HAYDEN, P.J., concurs.

SACKETT, J., concurs in part and dissents in part.

SACKETT, Judge (concurring in part and dissenting in part).

I concur in part and dissent in part. I would affirm the economic division made by the trial court.