In re the MARRIAGE OF Sandra Kay CHRISTENSEN and Dwayne E. Christensen.

Upon the Petition of Sandra Kay Christensen, Appellant,

And Concerning Dwayne E. Christensen, Appellee.

No. 94–1150.

Court of Appeals of Iowa.

Dec. 22, 1995.

Frank J. Nidey of the Maher & Nidey Law Firm, Cedar Rapids, for appellant.

Benjamin W. Blackstock and Eric C. Syverud of the Blackstock Law Offices, Cedar Rapids, for appellee.

Heard by HABHAB, P.J., and CADY and HUITINK, JJ.

CADY, Judge.

Sandra (Sandy) Kay Christensen appeals provisions of the parties' dissolution decree which found she had abandoned her antenuptial agreement and which distributed various pension funds, retirement accounts and real estate. We affirm as modified.

Sandy and Dwayne Christensen were married in May 1978. During the marriage, Dwayne worked at General Mills and Sandy worked at Mercy Hospital. Prior to the marriage, they entered into an antenuptial agreement. The agreement acknowledged the couple disclosed their complete financial affairs and had made a down payment on a home in Cedar Rapids using $16,704.59 of Sandy's money. It also stated upon termination of the marriage the first $16,704.59 of the marital estate would go to Sandy and Dwayne waived any right to this property.

Sandy and Dwayne sold the Cedar Rapids home later during the marriage and used the proceeds to purchase a country house in Belle Plaine on contract. While living in Belle Plaine, Sandy reduced her work hours at Mercy Hospital to care for her children and Dwayne's children, who were all from previous marriages. Sandy and Dwayne subsequently fell behind on their contract payments on the Belle Plaine home and the contract was forfeited. After a brief separation, the couple purchased a home in Van Horne.

Sandy returned to full time employment at Mercy, but soon left to take a position in a doctor's office. Her new job lasted only eleven months and Sandy began to draw unemployment benefits. She later opened a consignment shop with a partner, but this business caused a financial drain on her resources. Dwayne was unwilling to assist financially. After Sandy was unable to pay her monthly bills, she cashed in her pension from Mercy, receiving $7971.27 after penalties and taxes for early withdrawal. Dwayne throughout the marriage accumulated a General Mills retirement savings plan (RSP) valued at $7829.90 and a defined pension plan. Sandy filed for a dissolution of their marriage.

After trial, the district court awarded Dwayne the marital home, valued at $65,000 with equity of 38,000, and ordered him to pay Sandy $19,000. The court awarded Sandy a one-half interest in Dwayne's defined pension plan at the date of the dissolution and $1922.14 from the RSP.[1] The court also ordered Dwayne to pay Sandy $515 per month for eighteen months for short-term rehabilitative alimony to aid in her car payments and to assist in medical insurance payments, thereafter reduced to $151 per month for an additional eighteen months.

---

1. The trial court determined Dwayne was entitled to one-half of Sandy's pension plan withdrawn earlier by Sandy. The court took one-half of the amount received by Sandy, or $3,985.63 and credited against his RSP. The total amount of the RSP to be divided then amounted to $3844.27, which the court divided equally among the parties, awarding $1922.14 to Sandy.

Sandy filed a rule 179(b) motion alleging, among other things, the district court misread the antenuptial agreement and its application to the proceedings. Dwayne as well filed a Rule 179(b) motion seeking to receive all of his RSP pension. He argued it should have been set off against Sandy's withdrawn Mercy pension. The court amended its findings to state the antenuptial agreement applied but Sandy had abandoned it when she allowed their second home to go into default and the contract for sale be forfeited. It also amended its findings to award Sandy her entire Mercy Hospital pension plan and Dwayne his entire General Mills RSP funds as the amounts were essentially equal.

Sandy appeals. She contends the district court erred in finding an abandonment of the antenuptial agreement as the commingling of funds was not inconsistent with the terms of the agreement. She also argues the trial court erred in amending its original ruling concerning Dwayne's RSP account. She seeks an award of appellate attorney fees.

### I. Standard of Review

In this equity action, our review is de novo. Iowa R.App.P. 4. We have a duty to examine the entire record and adjudicate anew rights on the issues properly presented. *In re Marriage of Steenhoek*, 305 N.W.2d 448, 452 (Iowa 1981). We give weight to the fact findings of the trial court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R.App.P. 14(f)(7).

### II. Antenuptial Agreement

Generally antenuptial agreements will be upheld if they are fair between the parties and were entered into fairly, freely and understandingly. *Norris v. Norris*, 174 N.W.2d 368 (Iowa 1970). Antenuptial agreements are favored in the law and should be liberally construed to carry out the intention of the parties. *In re Marriage of Van Brocklin*, 468 N.W.2d 40, 45 (Iowa App.1991). Moreover, we construe and treat antenuptial agreements in the same manner as we do ordinary contracts. *Id.; Christians v. Christians*, 241 Iowa 1017, 1021, 44 N.W.2d 431, 433 (1950). Thus, such agreements can be

abandoned in the same manner as any contract. *Id.* at 45–46.

Abandonment of a contract is the relinquishment, renunciation or surrender of a right. *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 380 (Iowa 1983). Whether or not an abandonment occurred depends upon the party's intent to abandon and acts evidencing such an intent. *Id.* The act of abandonment must be unequivocal and decisive. *Id.*

A contract may be abandoned through conduct inconsistent with the continued existence of the contract. *Holi–Rest, Inc. v. Treloar*, 217 N.W.2d 517 (Iowa 1974); *In re Marriage of Pillard*, 448 N.W.2d 714, 715 (Iowa App.1989). Parties who engage in behavior inconsistent with the continued existence of a contract may estop themselves from asserting any rights established by the contract. *Iowa Glass Depot*, at 380.

We have dealt with the issue of the abandonment of an antenuptial agreement on two prior occasions. *See generally, In re Marriage of Pillard*, 448 N.W.2d 714. (Iowa App. 1989); *In re Marriage of Van Brocklin*, 468 N.W.2d 40 (Iowa App.1991). In *Pillard*, we found commingling of assets by the parties constituted an act inconsistent with the terms of an agreement which provided that all separate properties were to remain separate and free from claims by the other. The actions of the parties throughout the marriage implied they chose to ignore the agreement and treat their separate property as marital property. *Pillard*, at 716. In *Van Brocklin*, however, we found that the joint ownership of property and reciprocal wills which left the estate to the other spouse were not inconsistent with an antenuptial agreement which provided that any inheritance acquired during the marriage would be free from claims from the other spouse. *Van Brocklin*, at 46. The agreement specifically provided property could be placed in joint tenancy and the spouses could provide for disposition of property by will. *Id.* The fighting issue in this case is whether the actions of the Sandy, under the circumstances, were consistent with the particular terms of her antenuptial agreement.

■ We cannot find evidence Sandy's actions were inconsistent with the terms of the couple's agreement. The agreement specifically acknowledged Sandy contributed $16,704.59 as a down-payment on the parties' first house. It also provided upon termination of the marriage "the first $16,704.59 ... of the marital estate [would] be set over and become the sole and exclusive property of [Sandy]." Thus, the agreement acknowledged the money would be preserved as Sandy's even though it would be commingled. Furthermore, the agreement did not give Sandy a right to the marital asset which the money was used to acquire, but a right to receive the "first $16,704.59" of assets if the marriage terminated. Thus, the failure of the parties to prevent the forfeiture of the real estate contract on their second home cannot be construed as conduct inconsistent with the antenuptial agreement. It may have evidenced an intent to abandon marital property, but was not an unequivocal abandonment of the terms of agreement.

We find the trial court incorrectly interpreted the antenuptial agreement. Under our de novo review, we are unable to find the antenuptial agreement was abandoned and modify the decree to direct Dwayne to pay Sandy an additional $16,704.59.

### III. Pension Benefits

■ Pension benefits are treated as marital property in Iowa and are properly subject to equitable distribution. *In re Marriage of Mott*, 444 N.W.2d 507, 510–11 (Iowa App.1989). We find Sandy voluntarily withdrew her pension plan early resulting in her receipt of $7971.27 to pay off her debts and to buy inventory for her new business. This amount was equivalent to the value of Dwayne's RSP pension.

■ We find the trial court did not err in finding Dwayne was entitled to his entire RSP pension. In making this determination, we consider the financial benefit to Sandy under the antenuptial agreement. *See* Iowa Code § 598.21(3)(i) (1993) (provisions of an antenuptial agreement can be considered by the court concerning the equitable distribution of property); Iowa Code § 598.21(1)(i)

(court can take pension benefits into consideration).

### IV. Alimony

■ Alimony is not an absolute right; an award depends upon the circumstances of each particular case. *In re Marriage of Fleener*, 247 N.W.2d 219, 220 (Iowa 1976). We consider property division and alimony together in evaluating their individual sufficiency. *In re Marriage of Dahl*, 418 N.W.2d 358, 359 (Iowa App.1987); *In re Marriage of Griffin*, 356 N.W.2d 606, 608 (Iowa App. 1984). Moreover, we may consider the terms of an antenuptial agreement. Iowa Code § 598.21(3)(i) (1993).

■ We find Sandy's enhanced property distribution from her antenuptial agreement diminishes her need for short-term rehabilitative alimony. She has a long employment history and has shown she is capable of supporting herself financially. We recognize, however, Sandy's need for assistance during a transitional period. We therefore modify the decree and order Dwayne to pay Sandy $300 per month for eighteen months. Dwayne will not have an alimony obligation at the end of the eighteen month period.

### V. Appellate Attorney Fees

■ An award of attorney fees is not a matter of right, but rests within the court's discretion and the parties' financial positions. *In re Marriage of Kern*, 408 N.W.2d 387, 390 (Iowa App.1987). We are to consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal. *In re Marriage of Castle*, 312 N.W.2d 147, 150 (Iowa App.1981). Due to evidence indicating Dwayne's monthly income is nearly three times Sandy's income coupled with her obligation to challenge the trial court's findings, we find Sandy is entitled to $1200 in appellate attorney fees. Costs of the appeal to be assessed one-half to each party.

**AFFIRMED AS MODIFIED.**