## IN THE COURT OF APPEALS OF IOWA

No. 14-1398
Filed January 13, 2016

IN RE THE MARRIAGE OF MARY KAY FRARY
AND DANIEL L. KNIPPER

Upon the Petition of
**MARY KAY FRARY,**
        Petitioner-Appellant,

**And Concerning**
**DANIEL L. KNIPPER,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Linn County, Ian K. Thornhill,

Judge.


        Mary Kay Frary appeals the district court's ruling on Daniel Knipper's

motion to enforce the parties' dissolution decree and stipulation.  **REVERSED**

**AND REMANDED.**


        Benjamin W. Blackstock of Blackstock Law Offices, Cedar Rapids, for

appellant.

        Charles A. Hallberg of Hallberg Law Office, Cedar Rapids, for appellee.


        Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

Mary Kay Frary appeals the district court's ruling on Daniel Knipper's motion to enforce the parties' 2010 dissolution decree and stipulation. Mary Kay contends the district court's order "invalidat[es] portions of the prenuptial agreement entered into by the parties." Upon our review, we reverse the order of the district court and remand.

## I.        *Background Facts and Proceedings*

Mary Kay Frary and Daniel Knipper married in 1996. Prior to their marriage, Mary Kay and Daniel entered into a premarital agreement, providing in part that in the event their marriage was dissolved, each party would "retain and manage his or her own property" as set forth in the attached Schedule "A" and Schedule "B." The agreement stated in relevant part:

> 1. This agreement is intended to bind the parties and their heirs, assigns, and personal representatives, and limit the right of each party to participate in the property of the other in the event the intended marriage is terminated by a dissolution of marriage, altered by a Decree of Separate Maintenance, or affected by any other judgment, decree or legal proceeding that relates to the respective property rights of the parties, or the parties separate, die, or the occurrence or nonoccurrence of any other event in which the ownership of the property of the parties is to be determined.
> . . . .
> 3. It is the agreement and stipulation of both parties hereto that in the event of a dissolution of marriage that the property distribution and settlement shall be made precisely in accordance with this Agreement and that the property listed on Schedule "A" and Schedule "B", attached hereto and by this reference made a part hereof, remain the property of the person listing the property and who owned such property before the marriage.
> 4. It is the desire of the parties that this Agreement be given full force and effect by a court of law in the event of the initiation by either party of a dissolution of marriage, separate maintenance proceeding, separation, or any other legal proceeding relating to the respective property rights of the parties, or upon the death of either party. It is the intent of this Agreement that each party retain

ownership of the property listed by that party in Schedule "A" and Schedule "B" attached. In addition thereto, the parties agree:

. . . .

(d) In case of a divorce or death, Dan shall have no interest in any inheritance or gift to Mary Kay from her parents, or from any other source, or in any asset acquired prior to the marriage to Dan.

(e) In case of a divorce or death, Mary Kay shall have no interest in any inheritance or gift to Dan from his parents, or from any other source, or in any asset acquired prior to the marriage to Mary Kay.

The parties acknowledged in the agreement that they were "aware" of the Iowa Code provisions relating to division of property upon dissolution of marriage and premarital agreements.

Schedule "A" set forth the assets of Mary Kay the parties agreed would remain with Mary Kay, including: "IRA at 1st Nat. of Oelwein Prime Vest (First Trust) from divorce settlement [qualified domestic relations order] QDRO & previous Hall & Hall IRA Plan, $36,000"; "Mass. Fidelity IRA (Aegon) from divorce settlement, $36,000"; and "401k at Hall & Hall (18,000.00) of which was rolled over from divorce [from Denny Frary] QDRO, $22,000.00."

In 2009, Mary Kay filed a petition for dissolution of marriage. The parties reached a stipulation resolving property distribution and spousal support. Paragraph 9 of the stipulation provided:

**Savings Accounts, Stocks, Bonds, Retirement Plan or Other Investments**. Each party shall receive any savings, stocks, bonds and other investments in their name.

Any pension plans of a party shall be divided by way of a Qualified Domestic Relations Act Order (QDRO) for the contributions of each party to their pension plans during the term of the marriage and each party shall sign all documents necessary to carry out this provision. Petitioner shall prepare any QDRO for her pension plans and Respondent shall prepare any QDRO for his pension plans and such QDROs shall be submitted to counsel for the other party for approval, and said QDROs shall be submitted to the plan administrator for approval and to the court for approval.

The only mention of the parties' premarital agreement in the stipulation was in paragraph 1, with regard to real estate (e.g., "The above real estate is the property of Mary Kay Frary pursuant to . . . the Prenuptial Agreement signed by Mary Kay and Daniel on June 18, 1996 . . . ."). Both parties and their respective witnesses signed the stipulation. In May 2010, following a hearing, the district court entered a dissolution decree that approved and incorporated the parties' stipulation.

In January 2014, Daniel filed a motion to enforce decree and stipulation.[1] The motion alleged in part, "No QDRO has been submitted by [Mary Kay]." Daniel requested the court "enter appropriate Order compelling [Mary Kay] to file a QDRO in accordance with the agreement of the parties, and award [Daniel] attorney's fees for failing to do so under this decree, and enter other relief as is just and equitable under these circumstances."

Mary Kay filed a response to Daniel's motion and a request to enforce the premarital agreement. Mary Kay thereafter filed several additional responses to Daniel's motion, requesting the court enter an order "that she has no pension plan to be divided with the Respondent, Daniel Knipper, and to enforce the prenuptial agreement signed by both parties." Several more responsive pleadings were filed by the parties before a hearing took place on June 4, 2014.

On July 2, 2014, the district court entered an order granting Daniel's motion to enforce decree and stipulation. The court found in part:

---

[1] We question why Mary Kay did not take action to prepare a QDRO to divide her Advantage Sales plan—the sole plan Daniel's attorney requested her to QDRO—which Mary Kay conceded was subject to division. Mary Kay's inaction for more than three years after the dissolution decree was entered led to this proceeding.

Applying the governing law, the court finds that the parties' May 2010 stipulated settlement, and not the provisions of the 1996 prenuptial agreement, governs the division of the parties' retirement accounts because the settlement agreement, as written and agreed to by the parties, is a valid modification of their earlier premarital agreement. Said differently, the court finds the parties, in negotiating their stipulated settlement, modified certain terms of their earlier agreement. Such action is sanction by the common law of contracts, as well as Iowa Code section 596.7(1).[2]

If the parties had wanted to be bound by the entirety of the prenuptial agreement as part of their divorce, they could have simply set forth a wholesale incorporation of the prenuptial agreement into their stipulated settlement. They did not do this. They did, however, specifically make reference to the prenuptial agreement in section 1 of their Stipulation regarding real estate. No similar specific reference is included in section 9. Without a specific reference to the prenuptial agreement in section 9, the court finds the plain language of this section establishes that the parties agreed to equally divide "[a]ny pension plan of a party" then existing "for the contributions of each party to [such] plans during the term of their marriage." *See* Stipulation date May 11, 2010, p. 5, section 9. Moreover, the fact that section 9 also directs Petitioner to prepare "any QDRO for her pension plans" indicates the parties contemplated the division of more than one pension plan held by Petitioner at the time of the divorce. This reference also amplifies the court's skepticism as to Petitioner's instant position that she has no pension plan to be divided with Respondent as a result of the prenuptial agreement.

The court ordered Mary Kay to prepare a QDRO "for all pension plans held by her as of the May 11, 2010, equally dividing the pension plan with [Daniel] after the value of the pension plan as of June 28, 1996, is subtracted." The court further ordered: "If any pension plan held by [Mary Kay] on May 11, 2010, has been transferred to another plan or plans, a QDRO for the current plan

---

[2] We note that this provision of the Iowa Uniform Premarital Agreement Act refers only to revocation of premarital agreements, not amendments thereto. Iowa Code § 596.7 (2013) ("After marriage, a premarital agreement may be revoked only as follows: . . . ."). This provision differs from the corresponding provision of the Uniform Premarital Agreement Act, section 5, which provides: "After marriage, a premarital agreement may be *amended* or revoked only by a written agreement signed by the parties. The *amended agreement* or the revocation is enforceable without consideration." (Emphasis added.)

traceable to the plan in existence on May 11, 2010, shall be prepared under the same criteria listed above," and, "If any pension plan held by Petitioner on May 11, 2010, has been liquidated, [Daniel] may request further hearing to seek equitable relief."

Mary Kay filed a motion pursuant to Iowa Rule of Civil Procedure 1.904(2), alleging the court's order "in effect, holds that Mary Kay abandoned the Prenuptial Agreement," which she did not do. Mary Kay claimed "the premarital Gazette ESOP of $89,697.81 she received in a prior divorce [from Denny Frary] should be set aside to her and not be divided by QDRO in the divorce from [Daniel]." She further argued:

> It was the intent of the parties that the QDRO of any pension plan of the parties would include only a pension plan subject to division by QDRO. Mary Kay had two pension plans at the time of the divorce that could be subject to division by QDRO. One was her pension plan with her employer, Hall and Hall Engineering, which was reduced to a negative value after withdrawals were made during the marriage and after deduction of the Gazette ESOP funds. The other pension plan, and the one the parties eventually agreed to divide by QDRO, was Mary Kay's $2,663.96 pension plan with Advantage & Marketing that she acquired during the marriage. The Prenuptial Agreement provided that Mary Kay would retain all ownership rights in her Gazette ESOP and the pension plans she had prior to her marriage to Daniel. The only plan to be divided by QDRO, by agreement of the parties, was the Advantage plan.

Mary Kay further claimed:

> As urged to the court during oral argument in chambers at the hearing on June 4, 2014, the QDRO should be only of Mary Kay's $2,663.96 Advantage pension. This would conform to the statement made by Daniel's attorney in his June 2, 2010 letter (sent immediately after the Stipulation was entered and filed with the court) that the only QDRO of Mary Kay's pension funds should be of the Advantage pension.
> WHEREFORE the Petitioner, Mary Kay Frary, prays for an order of court to enlarge or amend the "Order re: Motion to Enforce Decree and Stipulation" filed July 2, 2014, to apply the Prenuptial

Agreement to the division of Mary Kay's pension plan and to divide the Advantage pension plan by QDRO with half of that plan, $1,331.98, set aside to Daniel from Mary Kay's Jackson annuity.

Daniel resisted Mary Kay's motion and filed a motion to strike her post ruling submissions. Daniel claimed:

[T]he Court based its ruling without taking evidence after hearing arguments of counsel in chambers at the date last set for hearing on June 4th 2014. Both parties agreed to allow the Court to enter a ruling on the record on that date. Since then Counsel for [Mary Kay] has filed responses and affidavits in reply to [Daniel]'s resistance to [Mary Kay]'s motion to enlarge and expand the Court's Ruling of July 2nd 2014.
     This is an obvious effort by [Mary Kay] to introduce new evidence into the record and should be stricken as superfluous and irrelevant material in the Court's record. The Court clearly based its decision on the state of the record at the time of the decree in 2010, and no further submissions or record by the parties are necessary for the Court to base its original decision, or reconsideration of the same, in this case.

In August 2014, after considering the some seven post-ruling filings by the parties, the district court entered an order denying Mary Kay's rule 1.904(2) motion. The court stated:

     After having carefully considering [Mary Kay]'s Rule 1.904(2) Motion and all relevant portions of the litany of pleadings that followed, the court **DENIES** Petitioner's Motion in its entirety. Given the extent of the post-Ruling pleadings and the time the court took to enter the instant Ruling, the court finds it prudent to reset the thirty-day clock originally imposed in its July 2, 2014, Order, for Petitioner to prepare and submit a QDRO. [Mary Kay] shall have thirty (30) days from today to prepare the QDRO.

Mary filed a notice of appeal.[3]

---

[3] Daniel claims Mary Kay's appeal was untimely because her rule 1.904(2) motion did not toll the time to file a notice of appeal "when the court ma[de] a decision as a matter of law." A notice of appeal is timely if it is filed within thirty days of the filing of the district court's ruling on a proper rule 1.904(2) motion. *Baur v. Baur Farms*, *Inc.*, 832 N.W.2d 663, 668 (Iowa 2013). When a rule 1.904(2) motion is used to obtain a ruling on an issue the district court may have overlooked, or to request the court enlarge or amend its findings when it fails to comply with rule 1.904(1), the motion is proper and will toll the

The flurry of paper continued. Both parties filed motions to stay the requirement that they prepare QDROs dividing retirement assets. Following another hearing, the district court entered an order granting the motions. However, the court denied Daniel's additional request to stay other provisions of the dissolution decree with regard to his spousal support and property settlement obligations.

In October 2014, with her appeal pending, Mary Kay filed an application to the district court to settle and approve her statement of evidence or proceedings pursuant to Iowa Rule of Appellate Procedure 6.806. The district court entered an order approving Mary Kay's statement of evidence or proceedings, noting Mary Kay's application "appear[ed] to be unresisted." Daniel thereafter filed a motion, pursuant to Iowa Rule of Appellate Procedure 6.807, to correct or modify the record with the Iowa Supreme Court challenging the statement of evidence or proceedings approved by the district court.

In March 2015, the Iowa Supreme Court entered an order finding "the statement of evidence was unnecessary in this appeal as a rule 6.806 statement is utilized when a transcript is unavailable," and "[a] rule 6.806 motion is not a tool to admit exhibits into the record that were previously not part of the record." The court ordered the district court to vacate is ruling approving the statement of evidence. The court further ordered:

---

time for appeal. *See In re Marriage of Okland*, 699 N.W.2d 260, 266-67 (Iowa 2005). Here, Mary Kay's motion amounted to more "than a rehash of legal issues previously raised"; it requested the court to make, enlarge, or amend findings of fact. *See Baur*, 832 N.W.2d at 669. Accordingly, we conclude Mary Kay's notice of appeal was timely because it was filed within thirty days after the court's ruling on the 1.904(2) motion. *See* Iowa R. App. P. 6.101(1). We have jurisdiction in this appeal.

Regarding [Daniel's] 6.807 motion, the court finds that exhibits 8, 20, 22, and 23 are part of the district court record on appeal as these items were filed in district court before the notice of appeal was filed. However, the parties shall not cite or refer to [Daniel's] attorney's statement in chambers at a hearing held on April 4, 2014, and [Mary Kay's] exhibit 25, as these items are not part of the district court record on appeal.

In considering this appeal, we do not consider those portions of evidence indicated by the supreme court as not being part of the district court record.

## II.    Standard of Review

We review this marital dissolution appeal de novo. *In re Marriage of Morris*, 810 N.W.2d 880, 885 (Iowa 2012).

## III.    Discussion

Mary Kay challenges the district court's ruling on Daniel's motion to enforce the parties' dissolution decree and stipulation. She raises several claims to support her contention, but the crux of her appeal is that the court's ruling "invalidat[ed] portions of the prenuptial agreement entered into by the parties." Specifically, Mary Kay takes issue with the court's ruling that her rollovers from a premarital retirement account should be divided with Daniel by QDRO.

As a general rule, premarital agreements are favored and should be construed liberally to carry out the intention of the parties. *In re Marriage of Christensen*, 543 N.W.2d 915, 918 (Iowa Ct. App. 1995). "The purpose of such contracts is to fix the interests of the respective parties in the property of the other." *See In re Marriage of Pillard*, 448 N.W.2d 714, 715 (Iowa Ct. App. 1989).

The decree in question incorporated the parties' property settlement stipulation.

> Although a stipulation of settlement in a dissolution proceeding is a contract between the parties, it becomes a final contract when it is accepted and approved by the court. When the stipulation is merged in the dissolution decree it is interpreted and enforced as a final judgment of the court, not as a separate contract between the parties.

*In re Marriage of Lawson*, 409 N.W.2d 181, 182 (Iowa 1987) (internal citations and quotation marks omitted). In construing a decree of dissolution of marriage, our supreme court has previously stated:

> The decree should be construed in accordance with its evident intention. Indeed the determinative factor is the intention of the court as gathered from all parts of the decree. Effect is to be given to that which is clearly implied as well as to that which is expressed. Of course, in determining this intent, we take the decree by its four corners and try to ascertain from it the intent as disclosed by the various provisions of the decree.

*In re Marriage of Goodman*, 690 N.W.2d 279, 283 (Iowa 2004).

Daniel and Mary Kay married in 1996. Prior to their marriage, they entered into a premarital agreement which provided that, in the event their marriage was dissolved, each would "retain and manage his or her own property" as set forth in the attached Schedule "A" and Schedule "B." Schedule "A" set forth "Information on Mary Kay Frary," including: "IRA at 1st Nat. of Oelwein Prime Vest (First Trust) from divorce settlement QDRO & previous Hall & Hall IRA Plan, $36,000"; "Mass. Fidelity IRA (Aegon) from divorce settlement, $36,000"; and "401k at Hall & Hall (18,000.00) of which was rolled over from divorce QDRO, $22,000.00."

During the marriage, Mary Kay rolled over the proceeds of her premarital retirement accounts and funds from retirement plans she received via QDRO from her divorce from Denny Frary, including $89,697.81 from a Gazette ESOP,

into her existing Hall & Hall plan. For example, Exhibit 20 shows Mary Kay's Hall & Hall retirement account included $18,736.34 in "rollover" with gains as of June 1996; Exhibit 24 shows Mary Kay's Hall & Hall account included $79,699.20 in "rollover" with gains as of March 1998; and Exhibit 24 shows Mary Kay's Hall & Hall account included $90,622.38 in "rollover" with gain/loss as of September 2000.

Mary Kay was employed by Hall & Hall at the time of her marriage to Daniel until that employment was terminated in 2002. Exhibit 24 shows Mary Kay's Hall & Hall account included $5902.77 in "401k Elective" and $5119.42 in "Employer Match" as of September 2000.

During the course of the marriage, Mary Kay removed funds from her Hall & Hall account. For example, in 1997, she took out a loan in the amount of $23,000. In 2000, Mary Kay and Daniel made a "hardship" withdrawal in the amount of $10,000. The withdrawals were used to pay for marital expenses.

In May 2010, the time of the parties' dissolution, the value of Mary Kay's Hall & Hall account was $70,758.36. This number represented the cumulative value of rollovers from Mary Kay's premarital retirement accounts, marital contributions to the account from Mary Kay's employment between 1996 and 2002, and deductions for the loan and hardship withdrawals during the marriage. In May 2010, Mary Kay also had a retirement plan with Advantage Marketing & Sales with a value of $2663.96.

In May 2010, prior to the parties' dissolution of marriage, Daniel filed an affidavit of financial status. With regard to the parties' retirement accounts, Daniel listed an "Advantage Sales 401k" valued at $2663.96, and an "IPC 401k"

valued at $62,060.24. These plans were in Mary Kay and Daniel's names, respectively, but listed as "joint" assets. The affidavit of financial status did not list Mary Kay's Hall & Hall account. The parties entered a stipulation for division of their marital assets, which provided in relevant part: "Any pension plans of a party shall be divided by way of a Qualified Domestic Relations Act Order (QDRO) for the contributions of each party to their pension plans during the term of the marriage . . . ." On May 27, 2010, the district court entered a dissolution decree that approved and incorporated the parties' stipulation.

On June 2, 2010, Daniel's attorney, Marty Hagge, sent a letter to Mary Kay's attorney, Benjamin Blackstock, stating as follows:

> The divorce was finalized on May 27, 2010. Enclosed you will find copies of the Stipulation, the Decree, and the Affidavit of Financial Status. You will need to prepare a Qualified Domestic Relations Order regarding Mary Kay's account with Advantage Sales. I will prepare one regarding Dan's account with IPC.

Neither party, however, prepared a QDRO.

Upon our review, we find the parties' stipulation, as incorporated into the decree, to be unambiguous as to the retirement account funds to be divided between the parties. The parties agreed to divide "[a]ny pension plans of a party . . . for the contributions of each party to their pension plans *during the term of the marriage*." We do not consider Mary Kay's rollovers of premarital retirement funds to her Hall & Hall plan to be "contributions" to the plan that the parties intended to divide. Mary Kay *did* make contributions to the Hall & Hall plan as a result of the efforts of her six years' employment during the marriage. It is these contributions that would be subject to division, but these contributions were essentially dissipated by the parties' loan and hardship withdrawals from

the account during the marriage which they used to pay marital expenses; the plan itself would have been reduced to a negative but for Mary Kay's rollovers.

Daniel argues the fact that the stipulation directs Mary Kay "to prepare 'any QDRO for her pension plans' indicates the parties contemplated the division of more than one pension plan held by [Mary Kay] at the time of the divorce." We note the stipulation required Daniel to also "prepare any QDRO for his pension plans." Daniel had only one plan. We are not persuaded that the reference to plans—in the plural—indicates the parties intended to deviate from their premarital agreement.

Indeed, Mary Kay stated the parties agreed in the stipulation that the only retirement plan of hers to be divided by QDRO was her Advantage Sales plan. Daniel's actions and the statements of his attorney support the existence of such an agreement. The parties' premarital agreement setting aside their premarital assets (including Mary Kay's retirement plans) as not being subject to division lends support to this conclusion. And the actions of both parties following the entry of the dissolution decree are consistent with this conclusion.

On our de novo review, we conclude that the only pension plan of Mary Kay's to be divided by QDRO is her Advantage Sales plan. The district court incorrectly interpreted the parties' stipulation incorporated into the decree and, accordingly, we reverse the court's ruling on Daniel's motion to enforce the parties' dissolution decree and stipulation. We remand for further proceedings consistent with this opinion. Costs of this appeal are assessed equally to each party.

**REVERSED AND REMANDED.**